## LEWIS v. CLYDE STEAMSHIP COMPANY.

(Filed June 10, 1903.)

1. EVIDENCE—*Sufficiency of Evidence—Questions for Court—Questions for Jury.*

   Where evidence is so uncertain as to make it conjectural and speculative, it should not be submitted to the jury.

2. EVIDENCE—*Sufficiency of Evidence—Salvage—Admiralty—Contracts.*

   In this action to recover salvage for saving a vessel the evidence is not sufficient to be submitted to the jury as to whether the defendant contracted to pay salvage.

3. CONTRACTS—*Corporations—Ultra Vires—Defense—Pleadings.*

   In an action to recover salvage for saving a vessel, a defense that a contract is *ultra vires* is in the nature of a plea of confession and avoidance and must be specially pleaded.

   CLARK, C. J., and DOUGLAS, J., dissenting.

This case was heard and determined at September term, 1902, of this court (131 N. C., 652). It is now before us upon a petition filed by the defendant to rehear.

The action was brought for the recovery by the plaintiff of $2,444.74 alleged to be due by the defendant company for money expended and services rendered in "caring for, floating and saving a steamship named 'The City of Jacksonville',"

which plaintiff alleged was on the 19th day of September owned and operated by the defendant and was stranded on the North Carolina coast.   Plaintiff averred that the said money was expended and services rendered at the request of defendant and with its knowledge, approval, consent and ratification, for which defendant promised and agreed to pay a reasonable value.   Plaintiff further alleged that "by reason of his skill, ability and superior knowledge of the business of caring for, handling and floating wrecked and stranded vessels, and as a result of his said efforts, work and services, which were attended with great hardship, exposure and danger, said steamer was eventually floated and saved, and the defendant saved property of the value of a great many thousands of dollars thereby."

The defendant denied that it owned or operated the steamship "The City of Jacksonville", on said date or at any other time.   It denied the material averments of the complaint in regard to the alleged contract.   The defendant asked for the removal of the case into the Circuit Court of the United States for the Eastern District of North Carolina.   This motion was denied and upon defendant's appeal the action of the court below was affirmed.   We have considered the contention of the defendant upon this point and think that it is correctly decided.   We do not deem it necesary to set out the facts in regard to this phase of the case.

Upon the trial below the following issues were submitted:

1. Did the Clyde Steamship Co. own the steamer City of Jacksonville between September 1, 1899 and June 1, 1900? Ans. No.

2. Did the plaintiff contract with the defendant to render the services set out in the complaint?   Ans.   Yes.

3. In what sum is the defendant indebted to the plaintiff for such services if they were rendered?   Ans. $2,000.

4. Was the contract between the plaintiff and defendant in writing? Ans. No.

Plaintiff testifies that he was 46 years old and had lived in Beaufort all of his life; that he was a sea-faring man for eight or ten years; that he had been a marine underwriter's agent since 1890, and that he was one at the time the steamship stranded; that he had had great experience with wrecks and he had been to a great many vessels; that he knew the Clyde Steamship Company; went to sea once in their ship; that its office is No. 5 Bowling Green, New York; that the City of Jacksonville wore the Clyde colors. There was a "6" on the flag fastened to the staff. The life preservers and buckets were branded "C. S. C." and also all the bed clothes, sheets and blankets, counterpanes, tableware and four boats. That he found the "City of Jacksonville" on Whalebone Inlet beach, Carteret County. She was stranded, pipes were leaky, reef was cut away. That he telegraphed the underwriters and the Clyde Steamship Co. at New York. That a telegram was brought him from the Secretary of the Boston Board of Marine Underwriters, saying: "Twenty-five thousand dollar hull, value thirty thousand. Protect. Advise me." He went to ship: sent Roberts and Mason there. That he went to New York to see Mr. Clyde; he saw Theodore Eger and Marshal Clyde. They told him to sit down and wait until Frank Clyde came. Frank Clyde is president of the Clyde line. He had a conversation with Marshal Clyde. Theodore Eger is general manager; talked with Eger, Marshal Clyde asked for a report of ship. He made the report and had a conversation about it. I said "I am going back to-night." Marshal Clyde said he wanted me to see Uncle Frank and his men and asked me did I want any money. I told him no. They told me to come in at nine o'clock next morning; went next morning. Eger was present. I was told to sit down and be comfortable. The in-

surance people came in and the two Clydes, Marshal and Frank, Eger and Mather were all there. I explained the condition of the ship and they gave me a sheet of paper and I drew a map on it. They said "On what you say, we are going to get this vessel." Went in office and Marshall Clyde and Eger were present. Marshal Clyde asked me when I was going to leave and I said "to-night"; asked me if I wanted any money and I told him "no, I've got money and don't want it." Eger said "We want you to go down there and get the ship off; we care nothing for the framework, but want the hull and machinery." Plaintiff told them the people they contracted with could not get it; that they were fresh-water wreckers. Plaintiff said to Marshal Clyde "you are sending me with bare hands, I can't save it that way; persons there say I bother them; I will go there and advise with the master and keep you posted." Marshal Clyde said to plaintiff to "spend what was needed, and when the ship is out we will see you handsomely rewarded outside of what the underwriters pay you." Plaintiff went to and came from the ship; was engaged in all 230 days; services are worth ten dollars per day and expenses; expenses were $444.74; paid out that amount of money and has not been paid back, except $25. Plaintiff does not state who paid him the $25.

On crosss examination the plaintiff said he was the underwriter's agent; his first orders came from the Boston Board of Underwriters; he was employed by them. The ship did not go into the hands of underwriters but he made out a bill against the underwriters and owners and forwarded it to the Boston Board—that is the way it has to go. Eger was present at all conversations. He and Clyde both said that the contract for saving the vessel had been made with the Atlantic Wrecking Company. He had a contract with the Clyde Steamship Company. The writing was to W. P. Clyde &

Co.   He has written them, cannot say that all letters were
so addressed.   When he works for the underwriters it is for
the owners; he had expected to get his pay of the under-
writers; he brought suit in Philadelphia and in his com-
plaint stated that the underwriters owed him; he signed the
paper; he swore to this.   Mather is Clyde's insurance ad-
juster and Clyde's agent, and made contract with the Atlantic
Wrecking Co.   When the ship was abandoned by the overseer
the underwriters took charge.   Plaintiff was sent there by
the underwriters.   It is the general custom of the ship to
have her own furniture marked in the name of the ship and
not in the name of the owner.   Plaintiff rested and defend-
ant moved to dismiss the complaint; motion denied and
defendant excepted.

Defendant then introduced the deposition of A. J. Wil-
kinson, Enrollment and License Clerk in the Custom House
of U. S. in New York.   He produced a deed duly enrolled
from the DeBary Merchants' Line of New York from the
said "City of Jacksonville" to the DeBary Merchants' Line
of New York City.   He also introduced certificate of en-
rollment of said steamship by Marshal Clyde of New York,
president.   Defendant again moved the court for judgment
of non-suit, motion denied and defendant excepted.

*Rountree & Carr*, for the petitioner.
*Simmons & Ward, D. L. Ward* and *C. L. Abernethy*, in
opposition.

Connor, J., after stating the case:   In the view which we
take of the case it is not necessary to set out the defendant's
prayers for instruction.   The court charged the jury that
they must find by the greater weight of the evidence that
the defendant company employed the plaintiff, engaged his
services to look after this wreck in their interest; that the
contract to bind the company must have been made with some

one authorized to speak for it; that some officer engaged to look after its ships engaged the services of the plaintiff; that a general manager would have such authority, but it must be the Clyde Steamship Officer and not that of some other company or corporation; that they were not to give a verdict for the plaintiff because he rendered services to the "City of Jacksonville," but he must have done so under contract or appointment with the defendant company, and that the burden was on the plaintiff to show by a preponderance of the evidence that the defendant employed him. The defendant assigned as error the refusal of the court to non-suit the plaintiff, and to the charge as given.

The only question thus presented for our consideration is whether there was from a legal standpoint any sufficient testimony to be submitted to the jury to sustain the plaintiff's allegation that the defendant company made a special contract with him for services to be rendered at its request in saving and floating the steamship. The finding of the jury upon the first issue eliminates from the controversy any right of the plaintiff to recover as upon a *quantum meruit* based upon an implied promise to pay for services rendered, of which it received the benefit. So far as the testimony shows, the defendant company had no interest in the said steamship, nor did it receive any benefit whatever from the services of the plaintiff in saving and floating her. The plaintiff averred that the "defendant owned and operated the ship," but, in the issue submitted to the jury, the question is confined to the ownership. If the issue in regard to the ownership of the steamship by the defendant company had been answered in the affirmative, by reason whereof any benefit accrued to it from the services of the plaintiff it would have been liable for such services.

We are thus brought to the consideration of the single question whether there was any *testimony fit to be submit-*

*ted to the jury to establish an express contract of employment.*
In considering the case from this point of view upon the
defendant's motion for non-suit, the testimony must be taken
as true and considered in the light most favorable to the
plaintiff. It will be well to keep in mind that so much of
the testimony as referred to the steamship carrying the Clyde
colors and of the life preservers and other property thereon
being marked "C. S. C.", is eliminated from our considera-
tion. This testimony was competent only upon the question
of ownership which has been negatived by the verdict. The
testimony in regard to the contract is indefinite and unsatis-
factory. If, however, tested by the rules laid down by this
court, it is of that character which the law denominates *evi-
dence,* and not merely speculative or conjectural testimony,
which is declared to be mere *scintilla,* it was the duty of the
judge to submit it to the jury and their peculiar and sole
province to pass upon it.

There is probably no more delicate duty imposed upon the
judiciary than the application of the well settled rules and
principles which have been adopted, in which it is sought to
define the line which distinguishes testimony which should
be submitted to the jury and that which should not.

Gaston, J., in *Cobb v. Fogalman,* 23 N. C., 440, says:
"Although the boundary between a defect of evidence and
evidence confessedly slight be not easily drawn in practice,
yet it cannot be doubted that what raises a possibility or con-
jecture of a fact never can amount to evidence of it."

Rodman, J., in *Wittkowsky v. Wasson,* 71 N. C., 451, in
discussing this question, quoting the language of the English
courts, says: "It is not enough to say that there was some
evidence; a scintilla of evidence would not justify the judge
in leaving the case to the jury. There must be evidence
from which they might reasonably and properly conclude
that there was negligence,"—that being the fact to be estab-

lished. And in *State v. Vinson,* 68 N. C., 335, the same learned justice says: "It is easy enough to express in general terms a rule of law . . . . but it is confessedly difficult to draw the line between evidence which is very slight and that which, as having no bearing on the fact to be proved, is, in relation to that fact, no evidence at all. We may say with certainty, that evidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict and should not be left to the jury."

Battle, J., in discussing and applying this principle in *Sutton v. Maddrey,* 47 N. C., 320, gives this illustration: "Suppose a plaintiff in a case was bound to show the existence of a fact within twenty years and the only testimony he offered was that of a witness who stated that it existed either nineteen or twenty-one years, and he could not remember which. Could the judge leave that isolated statement to the jury as testimony from which they were at liberty to find the issue in favor of the plaintiff? Certainly not."

Faircloth, C. J., in *Young v. Railroad,* 116 N. C., 932, says: "Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the parties having the burden of proof, unless the evidence be of such a character as that it would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence."

In *State v. Satterfield,* 121 N. C., 558, the same judge says: "The duty of drawing the line between a scintilla and evidence fit for the jury is sometimes difficult and delicate, but it is important, and the court must assume the responsibility. It is a preliminary question for the court who must find not that there is absolutely no evidence, but that the evidence is such as would justify a jury in proceeding to a verdict, such as will reasonably satisfy an impartial mind."

See also *Spruill v. Ins. Co.,* 120 N. C., 141; *Bank v. School,* &c., 121 N. C., 107.

Merrimon, J., in *State v. Powell,* 94 N. C., 968, says: "Legal evidence is not such as merely raises a suspicion, and leaves the matter in question to conjecture—as said above,, it is such as in some just and reasonable view of it—taking all the facts, whether they be many or few, as will warrant a verdict of guilty," citing *Cobb v. Fogalman,* 23 N. C., 440, and other authorities.

The difference between the province of the jury to pass upon the weight of the testimony when there is conflict, and to draw legal conclusions from testimony in respect to which there is no conflict, must be kept in mind. The question in this case is simply whether there is, admitting every word of the testimony to be true, any evidence upon which, as a matter of law, the jury could, under the instruction of the court, draw the conclusion that the plaintiff had shown an express contract to perform the services for and on behalf of the defendant corporation. There is no question in this case in regard to the *weight* of the testimony.

Applying this principle to the testimony in this case, we think that it was not sufficient to be submitted to the jury. A natural person becomes liable contractually when a proposition is made upon one side and accepted upon the other, or when a request is made for the performance of service and pursuant thereto the service is rendered. We are not now discussing the question of consideration, as no such question is presented in this case; nor are we discussing the question of ratification, for the same reason. It is elementary that a contract upon which a civil action may be founded must be the result of the concurrence or coming together of the minds of the contracting parties—a corporation, of course, speaking and acting through its authorized agents. The plaintiff says that his testimony establishes this condition. The "City

of Jacksonville" was stranded upon the coast of North Carolina. For the purpose of this discussion, she was not the property of the defendant company, but was the property of the DeBary Company. The plaintiff resided in Beaufort, N. C., and being a marine underwriter's agent, telegraphed the underwriters and the defendant steamship company at New York. In response thereto he received a telegram from the secretary of the Boston Board of Underwriters, stating the value of the vessel and using the words "Protect. Advise me." He sent persons to Hatteras and says: "I went to New York to see Mr. Clyde. I saw Theodore Eger and Marshall Clyde. They told me to wait until Frank Clyde came in; he is the president of the company." He then had a conversation with Marshall Clyde, who is the president of the DeBary Bay Company. This conversation was in the place of business of the defendant company. Marshall Clyde asked for a report of the ship, which the plaintiff made and had a conversation about it. He asked the plaintiff if he wanted any money. Eger was present; he was the general manager of the defendant company. The next morning the plaintiff again met the two Clydes with Eger and Mather, the latter being Clyde's insurance adjuster and agent. It seems from the testimony that there was a partnership known as "W. T. Clyde & Co." They said, "On what you say, we are going to get this vessel." Marshall Clyde asked him when he was going to leave and the plaintiff said "tonight." He asked him if he wanted any money and the plaintiff answered "no." Eger said, "We want you to go down there and get the ship off; we care nothing for the framework, but we want the hull and machinery." Marshall Clyde told him to go, "spend what is needed, and when the ship is out we will see you handsomely rewarded outside of what the underwriters pay you." This was clearly contractual language. There can be no mistake as to its purport and legal signifi-

cance.   Marshall Clyde had no connection, so far as the testimony shows, with the defendant company.

The plaintiff further said: "My first orders came from the Boston Board of Underwriters and owners.   I forwarded bill to the Boston Board.   Eger and Clyde both said that the contract of saving the vessel had been made with the Atlantic Wrecking Company.   I have a contract with the Clyde Steamship Company.   The writing was to W. P. Clyde & Co.   I have written them.   I can not say that all letters were so addressed.   I did expect to get my pay from the underwriters.   I brought suit in Philadelphia.   In my complaint I think I said that the underwriters owed me.   I signed the paper."   In this condition of the testimony we think it impossible, from a legal standpoint, for a jury reasonably to conclude that the plaintiff had shown a contract between the defendant company and himself.

The court instructed the jury that "A general manager would have such authority," that is, authority to make this contract.   The only testimony is that of the plaintiff, who says that Eger was the general manager.   It is by no means clear that this instruction is correct.

We base our conclusion, however, upon the proposition that the testimony, measured by the rules laid down by this court, is not sufficient to be submitted to the jury to sustain the plaintiff's contention.   In the opinion rendered by this court at the last term, the learned justice speaking for the majority of the court, said: "He (the plaintiff) further testified that the vessel in question wore the Clyde colors; that there was a large 'C' on the flag fastened to the flag staff; that the life preservers, etc., were all marked 'C. S. C.'   He also stated that he had some correspondence with the Clyde Steamship Company, the defendant in this action.   This, at least, was some evidence tending to prove that the plaintiff made a

contract with the defendant as alleged, and that the defendant had some substantial interest in the vessel."

With great deference for the opinion of the learned justice, we think that the testimony to which he refers, in the light of the finding of the jury upon the issue of ownership, should not have been considered by the jury as tending to prove that the plaintiff made a contract with the defendant. The plaintiff testified that "the writing was to W. T. Clyde & Co. I have written them. I can not say that all letters were so addressed." It is true that he used the words "have a contract with the Clyde Steamship Co." We are unable to see whether this language referred to the alleged contract in controversy or some other contract. If the former, it was a conclusion drawn by the plaintiff rather than the statement of a fact. The plaintiff himself appears to have regarded his employment as being by the Boston Board of Underwriters. He so expressly states. He says that he made out his account against them and brought suit in Philadelphia, and that he was sent there by the underwriters, all of which is inconsistent with the allegation that he was acting under a contract with the defendant company.

There is no evidence in the record as to when or what company employed the persons who performed the service of saving and floating the steamship, or who or what company took possession of her after she was floated. The plaintiff should undoubtedly be paid for his services, but we do not think that he produced sufficient testimony to be submitted to the jury that he made a contract with the defendant company to render the service. We can well understand that in the office of the defendant company in New York, in a conversation, in which the president of the defendant company, the president of the company owning the steamship and the superintendent of the defendant company all joined, there should be uncertainty as to which corporation was dealing

with the plaintiff, and that there should be some confusion in his mind. It would seem that good faith and fair dealing would have suggested to the several parties to explain to the plaintiff with whom and with what corporation he was dealing, and being employed. It is this very uncertainty, which surrounds the testimony, that in our opinion makes it conjectural and speculative, and not sufficient to be the basis of a verdict. It may be that in another trial both parties will be able to make a fuller disclosure of the facts which are within their knowledge. Courts should be, and we think are, careful not to trespass upon the "ancient mode of trial by jury," but they must be equally careful to preserve the symmetry of the judicial system which has come to us as the result of the wisdom and experience of the centuries, by firmly preserving the rights, duties and powers of the judge in the trial of causes at law. Verdicts must be founded upon evidence, and the court must say what is evidence. The weight, credibility and conclusions of fact to be drawn from it are the province of the jury.

The defendant contended before us that the contract, if made, was *ultra vires* and not binding upon the corporation. This defense is not raised by, or set up in the answer. The majority of this court were of the opinion on the former hearing that this defense could only be made by way of a plea of confession and avoidance. The former Chief Justice and Mr. Justice Montgomery thought otherwise, as set forth in the dissenting opinion. The authorities sustain the view of the majority of the court. It is said in 5 Enc. Pl. and Pr., page 95 : "In an action against a corporation, the plaintiff need not set out in his complaint or declaration the capacity of the corporation to make the contract sued on. When the defense of *ultra vires* is allowable to a corporation, the corporation must specially plead it." In the text-books, the

plea is always spoken of as "a defense."    1 Clark & M. Corp., Sec. 174; 5 Thomp. Corp., Sec. 5967.

The defendant will pursue such course in this respect as it may be advised.

Petition Allowed.

DOUGLAS, J., dissenting.    Taking the opinion of the court in its regular order, my first objection is to the vague and indefinite manner in which a well established doctrine is therein stated.    The possibility of bi-lateral construction is always a dangerous defect in the definition of a principle. In any event it tends to weaken the principle and may become the entering wedge in its eventual destruction.    During the recent floods in the Mississippi River, I was much impressed at the published statement that five hundred men were at work on the Waterloo levee attempting to stop up what was originally only a crawfish hole.    We may well learn a lesson from the laws of nature and hence I sometimes dissent more on account of what the opinion may lead to, than from what it actually decides.

The opinion says:    "The only question thus presented for our consideration is whether there was any *sufficient* testimony to be submitted to the jury to sustain the plaintiff's allegation," etc.    I have italicized the word "sufficient" as also some other words quoted in this opinion in order to emphasize my objective point.    The proposition would have been complete without this word, as a mere scintilla is not considered as evidence.    Even as it stands, the word has been so often defined as meaning anything more than a scintilla that it might not be objectionable were it not for other expressions in the opinion that tend to misconstruction.

Further on the opinion says: "In this condition of the testimony we think it impossible, from a legal standpoint, for a jury reasonably to conclude that the plaintiff had shown

a contract between the defendant company and himself."
This can only mean that in the opinion of this court the pre-
ponderance or greater weight of the evidence was against the
plaintiff.    What have we to do with deciding where lay the
greater weight of the evidence?    That matter is exclusively
within the province of the jury.    This is clearly set forth in
*Wittkowsky v. Wasson,* 71 N. C., 451, the leading case upon
the subject and the one on which the court now principally
relies.    The court in that opinion says in express words:
"Where there is *any* evidence to support a plaintiff's claim, it
is the duty of the judge to submit the question to the jury,
who are the exclusive judges of its weight."    And again,
"Whether there be *any* evidence is a question for the judge.
Whether *sufficient* evidence is for the jury."    It is true the
court then proceeds to use expressions which are capable of
a different construction, so much so that it felt it necessary
to expressly disclaim any intention to "extend or alter any
rule of practice or evidence heretofore recognized in this
State."    Judge Reade assented to the decision "upon the
explanation therein, that it was not to be interpreted as an
innovation upon the established rule that the jury are the
sole judges of the weight of evidence without any intimation
of opinion on the part of the judge."    Judge Bynum, while
concurring in the opinion of the court that there was no evi-
dence to go to the jury, dissented from the opinion as intro-
ducing a *new and dangerous* proposition.

It is remarkable that in this celebrated case the difficulty
with the court lay, not in determining the merits of the con-
troversy, but in arriving at the true meaning and tendency of
the opinion.    Time has more than justified the dissent of
the great jurist whose opinion stands as a monument to one
who seems to have joined the instinct of the seer to the wis-
dom of the sage.

In *Cobb v. Fogalman,* 23 N. C., 440, cited by the court,

Judge Gaston clearly draws the distinction between a defect of evidence and evidence confessedly slight, and properly decides the case on the ground that there was *no* evidence of a fraudulent intent. This appears from the evidence and is distinctly stated in the concluding paragraph, which is as follows: "We feel ourselves constrained to hold that there was error in leaving it to the jury to infer from the testimony a fraudulent intent in the defendant, when no *evidence* had been given from which such an intent could be inferred." There is no intimation in that opinion that this court can pass upon the sufficiency of the testimony.

I am aware that the term "sufficient evidence" has been frequently used by this court, but I respectfully submit that taken in connection with the context of those opinions, or at least with contemporaneous opinions by the same judges, it clearly appears that the term means simply that the evidence must amount to something more than a mere scintilla. A few examples will suffice: In *State v. Allen,* 48 N. C., 258, in an able opinion delivered by Judge Pearson, the court says: "An error may have crept into our practice by reason of the judges not having attached due importance to the distinction between the condition of things in England, whence we are in the habit of taking our notions of law, and the condition of things here, where the trial by jury is protected both by the Constitution and by legislative enactment. A judge is not at liberty to express an opinion as to the sufficiency of the evidence. When there is a defect, or *entire absence of evidence,* it is his duty so to instruct the jury, but if there be *any* competent evidence, relevant and tending to prove the matter in issue, it is 'the true office and province of the jury' to pass upon it, although the evidence may be so slight that any one will exclaim 'certainly no jury will find the fact upon such insufficient evidence;' still the judge has no right to put his opinion in the way of the free action of the jury, even should

he deem it necessary to do so, in order to prevent them from being misled by the arguments of counsel or their own want of apprehension." This opinion will well repay a careful perusal, and will clearly show that the great chief justice would never have concurred in *Wittkowsky v. Wasson* but for the positive assurance that it did not change or modify the existing rule that the jury were the sole judges of the *weight* of the evidence.

In *State v. Cardwell*, 44 N. C., 245, the court, by Battle, J., says: "Hence it is settled that if there be *no* testimony sufficient to establish a fact, it is the duty of the judge to say so; but if there be *any testimony tending* to prove the fact, he must leave its weight to be determined by the jury." The italics were by the court.

In the case at bar the opinion of the court quotes the language of Chief Justice Faircloth in *Young v. Railroad,* 116 N. C., 932, but in the same case immediately after the words quoted by the court on page 937, come the following: "There is, or may be, in every case a preliminary question for the judge, not whether there is absolutely no evidence, but whether there is more than a *scintilla* of evidence upon which the jury can properly proceed to find a verdict for the party introducing it, upon whom the burden of proof is imposed." The court also cites the oft-cited case of *Spruill v. Ins. Co.,* 120 N. C., 141. It would seem that the opinion taken in its entirety is free from ambiguity, but in *Cox v. Railroad,* 123 N. C., 604, decided by the same court and written by the same judge, appears the following unequivocal enunciation of the principle: "It is well settled that if there is *more than a mere scintilla of evidence tending to prove* the plaintiff's contention, it must be submitted to the jury, who alone can pass upon the weight of the evidence." See also *Moore v. St. Ry.,* 128 N. C., 455; *Cogdell v. Railroad,* 129 N. C,. 398; *Dorsett v. M'f'g Co.,* 131 N. C., at p. 263, where

Cox's case is cited with approval by Chief Justice Furches, speaking for a unanimous court. Further on, the opinion of the court says: "If, however, tested by the rules laid down by this court, it (the testimony) is of that character which the law denominates evidence, and not merely speculative or conjectural, which is declared to be a mere scintilla, it was the duty of the judge to submit it to the jury and their peculiar and sole province to pass upon it." With great respect for the learned judge that wrote the opinion I am compelled to say that this sentence conveys no definite meaning to my mind. The word "scintilla" has a fixed and definite meaning, both in law and in English. Webster says that it is "a spark; an iota; tittle." Black says that scintilla of evidence is "the doctrine that where there is any evidence, however slight, *tending* to support a material issue, the case must go to the jury, since they are the exclusive judges of the weight of the evidence." The italics are those of the learned author. This definition is supported by the uniform current of authorities in this State, unless changed by the opinion in the case at bar. Does the court mean to say that it intends changing the meaning of the rule by changing the definition of a word? Surely not; but why the constant reiteration of the phrase? My own views will be frankly stated. I adhere to the principle as stated in *Cox v. Railroad,* 123 N. C., 604, as the settled rule in this court. If the court intends to decide, directly or indirectly, in terms or by judicial intimation, that where there is *any* evidence, more than a scintilla, *tending* to prove a material issue, the court can withdraw the case from the jury and direct a non-suit on the ground that, in the opinion of the court, the evidence is not sufficient to justify a verdict; then I most respectfully but earnestly dissent from a proposition so new and dangerous, which in my opinion is without just foundation in authority, and in violation of the Constitution and laws of the State. Large numbers of cases

might be cited in support of my views. Those in this State are too well known to need citation, and I will cite but one case from the Supreme Court of the United States, where the rule is less strict than in this State. In *Railroad v. Egeland,* 163 U. S., 93, 98, the court holds that before the question can be withdrawn from the jury, the inference from the fact must be *"so plain as to be a legal conclusion."*

The former court affirming the court below held that there was evidence to go to the jury. The present court thinks otherwise, and bases its opinion upon the "uncertainty which surrounds the testimony." This very uncertainty seems to me a conclusive reason why it should have been left to the jury. In *Printing Co. v. Raleigh,* 126 N. C., 516, Chief Justice Faircloth, speaking for the court, says: "The defendant's motion to dismiss the action was equivalent to a demurrer to the evidence, and the plaintiff's evidence will be taken as true, and taken in the most favorable light for him. An appellate court reviewing a judgment of non-suit will assume every fact proved, necessary to be proved, when the evidence *tends* to prove it." See also *Coley v. Railroad,* 129 N. C., 407; 57 L. R. A., 817, and cases therein cited. In *Railroad v. Lowell,* 151 U. S., 209, 217, the court says: "In determining whether the plaintiff was so guilty of contributory negligence as to entitle the defendant to a verdict, we are bound to put upon the testimony the construction most favorable to him." Can there be any doubt that under such a rule the case should have gone to the jury? The opinion of the court also seems to lay great stress upon the absence of "contractual words." Such words are not required to make a contract binding and are rarely used in the ordinary, affairs of life. If a person says to a merchant, "send me up a bag of flour" or "give me a pound of sugar," can there be any doubt that he is bound for the price? If a corporation through its general manager says to a professional salvor,

"We want you to go down there and get the ship off," why is is not equally liable? The evidence referred to in the former opinion of the court relating to the ship wearing the Clyde colors, flying the Clyde flag, and using furniture marked C. S. C., was cited as tending to show that while the defendant may not have had the legal title to the ship; it may have had in it at least what is equivalent to an insurable interest. For some reason in writing the former opinion of the court, I omitted to cite authorities in support of the proposition that the plea of *ultra vires* is a defense in the nature of confession and avoidance, with the burden of allegation and proof resting upon the party seeking its protection. 5 Thomp. Corp., Sec. 5967; 1 Clark & M. Corp., Sec. 174; 5 Pl. & Pr., 96; Elliott Pr. Corp., 57; 2 Spelling, Sec. 780, 848, 867. I deeply regret being compelled to dissent so often and at such length, as I am aware that the time thus spent might well be given to the preparation of the opinions of the court, but when great principles are at stake that have exercised a dominating sway over my judicial life, I feel compelled to give them what support I can, trusting to a generous profession for the appreciation of my motives and to time for the vindication of my convictions.

CLARK, C. J., concurring in dissent. I concur in what is so clearly and forcibly said by Mr. Justice Douglas, and I regret that I can not add emphasis to the views stated by him and by Judge Bynum in *Wittkowsky v. Wasson.* "Juries are the sole and exclusive judges of the facts," and judges have no right to intrude into that province. The maintenance of this principle of the law inviolate is guaranteed by the Constitution, and its preservation is as necessary now as at any time in the history of our race for the protection of the liberty and the property of the humblest citizen. The Act of 1796 (now Code, 413) forbidding the trial judges to intimate any opinion upon the weight of the evidence is

worse than useless if the appellate court can weigh the evidence. The trial judge who at least sees the bearing and demeanor of the witnesses upon the stand, and knows the surrounding circumstances (advantages which are denied to us) can far better judge of the weight and *sufficiency* of the evidence than an appellate court. Why deny him, so rigorously an expression of opinion which the jury is not compelled to accept, if the appellate court can weigh the evidence and hold it *insufficient* to justify the conclusion at which the jury have arrived, and in a case, too, in which the trial judge has not thought he ought to exercise his undoubted prerogative to set the verdict aside, as he would have done, if he deemed it contrary to justice? If the trial judge sets the verdict aside, the very same evidence may be submitted to another jury for its consideration; whereas if the appellate court adjudges the evidence *insufficient,* the appellee not only loses his verdict, but all opportunity to try his cause by a jury at all, unless he can get additional evidence.

Because there is no power anywhere to review the action of an appellate court in holding that there was *not sufficient* evidence to justify a verdict which has been rendered, is an additional and the strongest reason why an appellate court should never so hold. So important a matter is this that the Court of Appeals is expressly forbidden by the Constitution of New York to set aside a verdict even on the ground that there is *no* evidence when the court below is unanimous that there was evidence, and our Superior Court must be unanimous, there being only one judge. The time-honored limitation in this State, within which an appellate court can set aside a verdict, is when "there is *no* evidence beyond a scintilla."