BERRY v. LUMBER CO.

(Filed May 16, 1906).

*Trespass — Grants —Adverse Possession—Disabilities—Evidence as to Damages.*

1. Where there are two or more conflicting titles derived from the State, the elder shall be preferred upon the familiar maxim that he who is prior in time shall be prior in right and shall be adjudged to have the better title.

2. Adverse possession of the plaintiffs under a junior grant (which was color of title) from October, 1888, to December, 1897, vested the title in them as against the owners of the legal title under a senior grant, it not appearing that any of the latter were exempt from the operation of the statute of limitation by reason of of any disability, and a married woman who acquired no title by another junior grant issued to her, cannot use her disability to defeat the right of the plaintiffs.

3. Adverse posesssion relates only to the true title and the exemptions in the statute as to those under disability can apply only to one having by virtue of his title a right of entry or of action.

4. A finding that the plaintiffs have been in adverse possession "of the land within the lines" of the Berry grant and in adverse possession "of the Berry grant" means all of the land within the lines and boundaries of the said grant, both that above and below a certain line.

5. In an action for damages for trespass where the plaintiffs owned only that part of a tract north of a certain line, evidence that trees were cut on the tract, but there was nothing to show whether north or south of said line, was too conjectural to form the basis of a verdict.

6. The exceptions taken to the suggestion of the court, in regard to the effect of the introduction of a grant and to its refusal to allow the grant to be withdrawn, were not well taken, as those matters were peculiarly within the judge's discretion.

ACTION by Leola Berry and others against W. M. Ritter Lumber Co., heard by *Judge W. R. Allen* and a jury, at the December Term, 1905, of the Superior Court of BURKE.

Plaintiffs sued for damages in the sum of $1,800 alleged to have been sustained by a trespass of the defendant in entering upon a tract of land containing 605 acres and cutting timber trees standing and growing thereon. The defendant denied the trespass and pleaded specially a grant issued to M. C. Houck, hereafter mentioned, and also the Cathcart grant, and that the lands therein described had been conveyed by Dwight M. Lowry and wife to the Steel & Iron Company, and the title had passed by mesne conveyances to the defendant.

Plaintiffs introduced a grant to B. A. Berry for 605 acres, dated October 31, 1888, and issued upon an entry to M. L. Pearcy, dated December 13, 1886, which covered the land in dispute, and plaintiffs by mesne conveyances, which were put in evidence, connected themselves with said grant. They then offered evidence tending to show that they had been in adverse possession of the land from October, 1888, to November or December, 1897, but they had no possession after the latter date. In 1902 or 1903, the defendant entered upon the land and committed the trespass alleged in the complaint.

Berry *v.* Lumber Co.

Defendant introduced a grant to M. C. Houck, dated June 29, 1888, and registered June 8, 1889. It was issued

THE ABOVE IS THE MAP REFERRED TO IN THE CASE.

on an entry of May 7, 1887, and also covered the *locus in quo* and all of the land conveyed by the Berry grant. It then connected itself with this grant by showing mesne convey-

ances. The defendant next introduced a grant to William Cathcart for 59,000 acres dated July 20, 1796, which covered the *locus in quo,* and all the land described in the Berry and Houck grants which is north of the south boundary of the Cathcart grant, or what is known in the case as the "Cathcart line," and which has been designated by this court for greater certainty as the line between the figures 35 and 36, shown on the accompanying map. There was no evidence that any one of the persons claiming under the Cathcart grant was under disability. It was admitted that those claiming under that grant had not been in the actual possession of the land covered by the Berry grant or any part of it, though they had been in actual and continuous possession of the other land described in the Cathcart grant and not covered by the Berry grant. There was evidence on the part of the defendant tending to show that the plaintiffs had not held possession adversely of the land described in the Berry grant for seven years. M. C. Houck, wife of John M. Houck, was under the disability of coverture from 1866 to 1900, when she was divorced and afterwards married her present husband, Geo. W. Green. There was evidence tending to show that the trees which were cut on the Berry tract had been counted, but it did not appear how many were cut on that part of the land south of the Cathcart line and how many north of that line. The evidence on this question was substantially like that of Aaron Pearcy, which was as follows: "The timber was cut off by the W. M. Ritter Lumber Co.'s hands. It was heavily timbered land. On the south part was heavy white pine timber. Hampton and William Berry helped me count the timber. We took it abreast and marked the stumps and counted them. I went on the outside because I knew the lines and counted only on the 605 acre tract; we counted none on the Scotchman tract. We counted 4,210 trees, I think there were about 9,000 stumps in all; something over. These were outside of the 26 acre tract. The

timber was worth about one dollar per tree, it was easy to log, as there were tram roads; no one ever built a tram road in our country except the defendant. The customary price was $1. The defendant bought at that ; no one except defendant was running any mill in that section." The plaintiffs at first contended, and proposed to show, that the Cathcart grant did not cover the Berry tract of 605 acres or any part of it, and the defendant undertook to prove that it did cover the said tract and consumed a day in its effort to do so. The court suggested that it was best for the plaintiffs to admit that the "Berry 605 acre tract" was covered by the Cathcart grant. After some colloquy between the court and counsel, it was admitted by both parties that the Cathcart grant covered the 605 acres of land described in the Berry grant, the court at the time stating to counsel that they must act on their own judgment, as its views of the case might be erroneous. It appears by inference that the defendant requested the court to be allowed to withdraw the Cathcart grant and the request was refused. Defendant excepted to the suggestion of the court to the plaintiff, and to all of the rulings of the court in this connection which related to the Cathcart grant. It was agreed that the judge should find the facts as to the title and as to all other matters outside of those embraced by the issues to be submitted to the jury, and that the court's conclusions of law thereon and its judgment should be entered, subject to exceptions by either party. The defendant requested the court to charge the jury as follows: "1. That there is no testimony from which the jury can determine the number or value of the trees cut north and of those cut south of the Cathcart line; the only testimony being that the three witnesses counted the stumps on, but none off, the 605 acre Berry tract, a portion of which lies north and a portion south of the Cathcart line. 2. That the plaintiffs have not been shown, in any view of the testimony and admissions, to be

BERRY *v.* LUMBER CO.

the owners of any of the lands south of the Cathcart line."
These instructions were refused and defendant excepted.
The court charged the jury: "1. That although the suit was
brought to recover only $1,800, they might assess damages
to the full amount of $1,800 in response to the second issue,
as to the land north of the Cathcart line, and the same
amount as to that south of said line, in response to the fourth
issue, provided they found there was that much damage to
the land south of the Cathcart line. 2. That they could find
from the evidence what amount of damage was done south
and what amount north of this line, in response to the second
and fourth issues." The defendant excepted to these instruc-
tions and assigned as a special ground of exception to the
second instruction "that there was no evidence tending to
show what amount of the entire damage was done by the cut-
ting of timber south of the Cathcart line or what amount of
timber was cut north of the Cathcart line, within the lines
and boundaries of the Berry grant, and that one of the wit-
nesses offered by the plaintiff testified that most of the white
pine trees, which he said were the most valuable timber trees
on the land, were cut on the southern part of the Berry grant."
The following are the issues with the answers thereto: "(1)
Did the defendants cut timber on the land within the lines
of the Berry grant north of the line of the Cathcart grant?
Ans. Yes. (2) If so, what damage was caused thereby?
Ans. $1,800. (3) Did the defendants cut timber on the land
within the lines of the Berry grant south of the line of the
Cathcart grant? Ans. Yes. (4) If so, what damage was
caused thereby? Ans. $600. (5) Have plaintiffs and those
under whom they claim been in the continuous, exclusive, ad-
verse possession of the land within the lines of the Berry
grant claiming thereunder for seven years prior to October
30, 1896? Ans. Yes." (6) Have the plaintiffs and those
under whom they claim been in the continuous, exclusive,
adverse possession of the Berry grant claiming thereunder

prior to November, 1897? Ans. Yes." The following judgment was rendered: "This cause coming on to be heard, and it being admitted that the Berry and Houck grants, which were introduced in evidence, covered the land in controversy, and that the Cathcart grant, also introduced in evidence, covered all of the said land north of the line on the plot marked "Cathcart line," and the jury having returned the verdict appearing in the record and the parties agreeing that the jury should not answer the issue as to title, and that the court should answer that issue, after the rendition of the verdict, and should find such additional facts bearing upon the question of title as are deemed material: The court finds as facts: (1) That the entry under which the plaintiffs claim can be located and all of its calls satisfied without embracing any of the land in controversy, and that there was no actual survey of said entry prior to the issuing of the grant to M. C. Houck. (2) That at the time of the said entry under which the plaintiffs claim, and from that time continuously to August 20, 1900, the said M. C. Houck was a married woman, and that plaintiffs have not been in possession of said land since 1897. The court thereupon finds that the plaintiffs are the owners of the land described in the Berry grant, which is north of the line of the Cathcart grant, and that they are not the owners of the land described in the Berry grant, which is south of said Cathcart line and which is embraced in the Houck grant. It is thereupon considered and adjudged that the plaintiffs are the owners in fee of the land described in the Berry grant which is north of the Cathcart line and that they are not the owners of any land south of said line which is covered by the Houck grant. It is further considered and adjudged that the plaintiffs recover of W. M. Ritter Lumber Company the sum of eighteen hundred dollars and their costs, to be taxed by the clerk."

The defendants having excepted to the conclusion and judgment of the court, that the plaintiffs are the owners of

the land described in the grant to Berry for 605 acres which lies north of the Cathcart line, appealed to this court.

*John T. Perkins* for the plaintiff.
*A. C. Avery, S. J. Ervin, T. A. Love* and *L. D. Lowe* for the defendant.

WALKER, J., after stating the case: There was some discussion before us as to the validity of the Pearcy entry upon which the grant was issued to M. C. Houck. We have not set out the contents of that entry, as we do not think it material to the decision of the case that we should pass upon that question. We will assume for the sake of argument that but for the Cathcart grant, the defendants would have the older and consequently the better title, the Houck grant having been issued before the Berry grant, and the Pearcy entry being, as we will also assume, too vague in its description of the land entered to constitute notice to the subsequent enterer and grantee, M. C. Houck, of the prior entry *(McDiarmid v. McMillan,* 58 N. C., 29), so as to raise an equity in behalf of the plaintiffs claiming under the junior grant and senior entry, to have M. C. Houck declared a trustee of the legal estate for them. *Featherston v. Mills,* 15 N. C., 596; *Harris v. Ewing,* 21 N. C., 369; *Plemmons v. Fore,* 37 N. C., 312; *Gilchrist v. Middleton,* 107 N. C., 663; s. c., 108 N. C., 705; *Kimsey v. Munday,* 112 N. C., 816. A cause of action based upon such an alleged equity existing in favor of the plaintiffs was set up by way of amendment to the complaint, but the view we take of the case excludes it from consideration.

With that question eliminated, the case stands thus: The Houck and Berry grants were both ineffectual to pass title to any land covered by the Cathcart grant, as the latter being of older date, the State had no title to that land at the time the junior grants were issued, and the lands were there-

fore not subject to entry and grant. The State could not grant that which it did not itself have, and, therefore, where there are two or more conflicting titles derived from the State, the elder shall be preferred upon the familiar maxim that he who is prior in time shall be prior in right, and shall be adjudged to have the better title. *Hoover v. Thomas,* 61 N. C., 184; *State v. Bevers,* 86 N. C., 588; *Gilchrist v. Middleton,* 108 N. C., 705; *Janney v. Blackwell,* 138 N. C., 437; Broom's Legal Maxims (8 Am. Ed.), 352. It being true, therefore, that no title passed by the Houck and Berry grants to the land covered by the Cathcart grant, the persons who can connect themselves with the latter grant are entitled to the land covered by both the Houck and Berry grants and north of the southern boundary described in the Cathcart grant, unless that title has been in some way divested. Those who claim under the Houck grant do not pretend to have had any possession of the land north of the "Cathcart line," but the plaintiffs assert that while their Berry grant did not convey any title, it was color of title, and that they and those under whom they claim had adverse possession of the said land from October, 1888, to December, 1897, through their tenant, Elizabeth Barrier, she having been ousted in the latter year, and the jury under proper instructions from the court have so found. This vested the title in the plaintiffs as against the owners of the legal title under the Cathcart grant, it not appearing that any of them were exempt from the operation of the statute of limitations by reason of any disability. Right here the learned counsel for the defendants strenuously contended that the statute did not run against Mrs. Houck during her coverture, and relied on section 148 of The Code, which is as follows: "If a person entitled to commence an action for the recovery of real property, or to make an entry or defense founded on the title to real property or to rents or services out of the same, be at the time such title shall descend or accrue, a married woman, then

such person, notwithstanding the time of limitation prescribed in this title be expired, may commence her action or make her entry within three years after discoverture." And also on the Acts of 1899, ch. 78 (now Revisal, sec. 363), which is as follows: "In an action in which the defense of adverse possession is relied upon, the time constituting such adverse possession shall not include any possession had against a *feme covert* during coverture, prior to February 13, 1899. The contention is a novel one. A possession cannot well be adverse to any one who has no title or right of entry or action. It cannot be adverse to one who is a mere stranger to the true title and who has no claim whatever to the land, for he has no right to be barred by such a possession. It has sole reference to the owner of the title, as the very language of the various sections of The Code having reference to the subject clearly shows. It will be noted that section 148, on which counsel relied, uses the words at the outset, "If a person *entitled* to commence any action for the recovery of real property, or to make an entry or defense founded on the *title* to real property," etc. One who has no right cannot properly be said to be "entitled to bring an action." And certainly he has no right of entry or action or any defense "founded on the title to real property" because he has no such title. The law does not attempt to do the vain thing of barring by adverse possession something that has no real existence. "Adverse possession," therefore, is predicable only of the title to land or other thing in controversy. It is the possession and enjoyment of real property or any estate lying in grant continued for a length of time and held adversely, and in denial and opposition to the title of another claimant. Black's Dict., 44. It is held in opposition, instead of in subordination to the true title, and is an actual, visible and exclusive appropriation of land, commenced and continued under a claim of right, with the intent to assert such claim against the true owner, and accompanied by such an invasion

of the rights of the opposite party as to give him a right of action. 1 Am. & Eng. Enc. (2 Ed.), 789. The term designates a possession in opposition to the true title and real owner, and implies that it commenced in wrong by ouster or disseizin, and is maintained against right. It is openly and notoriously in defiance of the actual title, so as to turn the estate of the true owner into a mere right of entry or of action. *Ibid.,* note 1, citing *Alexander v. Polk,* 39 Miss., 755. Within any of these definitions of the term, adverse possession relates only to the true title and the exemptions in the statute as to those under disability can apply only to one having by virtue of his title a right of entry or of action. If this were not true, a person might acquire ever so good a title, as against the former owner, by adverse possession begun and continued for thirty years, and yet the very day after his perfect title had accrued, a married woman might tortiously enter upon the land and hold it against him on the ground that she had been under the disability of coverture for the 30 years during which he had the possession. But section 146 of The Code (now Revisal, 386,) is in itself a conclusive answer to the argument. That section provides: "In every action for the recovery of real property or the possession thereof, or damages for a trespass on such possession, the person establishing a legal title to the premises shall be presumed to have been possessed thereof within the time required by law; and the occupation of such premises by any other person shall be deemed to have been under, and in subordination to, the legal title, unless it appears that such premises have been held and possessed adversely to such legal title for the time prescribed by law before the commencement of such action." M. C. Houck acquired no title by her grant, because the State had already parted with its title, and she cannot, therefore, use her disability to defeat the right of the plaintiffs.

The position of the defendant that it has not been found

as a fact by the jury, or by the court under the agreement
of counsel, that the adverse possession of the plaintiffs ex-
tended to any part of the land covered by the Berry grant,
which is north of the Cathcart line, is clearly untenable. The
fifth and sixth issues and the responses thereto are as follows:
"Have plaintiffs and those under whom they claim been in
the continuous, exclusive, adverse possession of the land
within the lines of the Berry grant claiming thereunder for
seven years prior to October 30, 1896? Yes. Have plain-
tiffs and those under whom they claim been in the contin-
uous, exclusive, adverse possession of the Berry grant claim-
ing thereunder prior to November, 1897? Yes." The
case states (record, p. 29,) that there was evidence offered by
the plaintiff tending to show that Elizabeth Barrier, the ten-
ant of W. A. Berry, under whom the plaintiffs claim, had
actual possession of the "land in controversy" for more than
seven years and that she had been ejected from "the said
land" under a writ issued from the Federal Court. We
find other evidence in the case tending to show that there
was an adverse possession of the same land by Elizabeth
Barrier. It was agreed that the court might find the facts
relating to the title and declare the law thereon, judgment
to be entered accordingly. The court found the facts in
regard to the adverse possession to be as stated in the fifth
and sixth issues, and the answers thereto which were made
by the court. There is no exception to the effect that the
court improperly ruled as to what would constitute an ad-
verse possession. None of the exceptions is sufficient to
raise any such question; nor is it now intended to raise any
such question as we understand; but the contention simply is
that the fact is not found whether the possession was above
or below the Cathcart line. We think the verdict sufficiently
ascertains that the possession extended to the land covered by
the Berry grant, and this, in the absence of any restrictive
words, means, as the verdict states, all of the "land within

the lines and boundaries of the Berry grant," both that above and below the Cathcart line. We conclude that the fact of possession above the Cathcart line was sufficiently found to enable the court to proceed to judgment, unless there are other errors.

The defendants next contended that the evidence did not show, with sufficient clearness and certainty for the jury to act upon it, how many trees were cut north of the Cathcart line and how many south of it. We think the exception is well taken and the court should have given the instruction, in regard to this phase of the case, which was requested by the defendants. The evidence tends to show that trees were cut on the Berry tract, but there is nothing to show on what particular part of the land they were cut, whether north or south of the Cathcart line. The jury cannot be allowed to guess as to where the cutting was done. The burden was upon the plaintiffs to show that the trespass was committed on the land belonging to them, and, as a part of the Berry tract did not belong to them, evidence tending to show that trees were cut on the Berry tract is not necessarily proof that they were cut north of the Cathcart line. They may all have been cut below that line. If they were cut on both sides of the line, it does not appear how many were cut on the north side or how many on the south. *State v. Collins,* 72 N. C., 144. The evidence was not of the kind that should form the basis of a verdict. It is too conjectural. *March v. Verble,* 19 N. C., 19; *Lewis v. Steamship Co.,* 132 N. C., 904; *Byrd v. Express Co.,* 139 N. C., 273.

The exceptions taken to the suggestion of the court, in regard to the effect of the introduction of the Cathcart grant and to its refusal to allow the grant to be withdrawn by the defendant, were not well taken, as those matters were peculiarly within the judge's discretion. The jury were out of the room when the suggestion was made, and the parties afterwards, in the presence of the jury, admitted that the

Cathcart grant covered the land described in the Houck and Berry grants. Nor do we see that it had the effect of changing the cause of action. The plaintiffs may have shifted their position a little in submission to the judge's intimation, but at least one of the causes of action, the trespass, was not changed. Both parties seem to have abandoned their original contentions, but the issues between them remained practically the same. No harm has come to the defendants from the suggestion of the judge and his subsequent rulings in connection with the withdrawal of the Cathcart grant. The refusal of the judge to permit the withdrawal of the Cathcart grant worked no prejudice to the defendant and does not raise a practical question, as in the new aspect of the case presented by the suggestion of His Honor and the changed attitude of the parties resulting therefrom, the plaintiff's counsel would undoubtedly have reintroduced the grant at the first opportunity, as that course would have been the only one left to him, if he expected his client to succeed in the action. His right to reintroduce the grant cannot be questioned. This, perhaps, was the reason which influenced the court to rule as it did. The other exceptions may not be again presented and require, therefore, no separate discussion at this time.

There must be another trial because of the error as to damages, but it will be restricted to the first and second issues which will be amended so as to read as follows: 1. Did the defendants cut the timber on that part of the land, described in the Berry grant, which lies north of the southern boundary of the Cathcart grant, known in the case and now designated on the map as the line between figures 35 and 36? 2. If so, what damage have the plaintiffs sustained by reason of the said cutting of timber?

The other issues (except the third and fourth, which will be set aside,) and the findings and rulings of the court, not relating to the first and second issues, will stand and a new trial is awarded only as to the damages.

New Trial.