SARAH F. SPRUILL v. NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY.

*Action on Life Insurance Policy—Life Insurance—Contract—Suicide by Insured—Sane or Insane—Trial—Presumption—Rebuttal—Directing Verdict—Sufficiency of Evidence—Burden of Proof.*

1. A clause in a policy of insurance inserted and intended to protect the insurer from all liability for any form of suicide, whether the assured be sane or insane, is not illegal or contrary to any well settled rule of public-policy or morals.

2. Where a policy of life insurance provides that it shall become void if the assured shall die by his own hand, whether sane or insane, it is immaterial what the mental condition of the assured who dies by his own hand is at the time of his death, the liability of the insurer not being affected by the degree of insanity ; and in the trial of an action on such a policy testimony as to the mental condition of the assured, who died by his own hand, was properly excluded.

3. Where there is no evidence, or a mere *scintilla* of evidence, or the evidence is not sufficient, in a just and reasonable view of it to warrant an inference of any fact in issue, the Court should direct a verdict against the party upon whom the *onus* of proof rests.

4. In the trial of an action on a life insurance policy which provided that it should be void if assured died by his own hand, sane or insane, within two years from date of policy, the only issue was, "Did the assured die by his own hand within two years from the date of the policy sued on?" A *prima facie* case being made for the plaintiff

by proof of the issuance of the policy and death of the assured, the defendant read in evidence the "proof of loss" furnished it by plaintiff, in which it was stated that the cause of death was "a pistol shot in his own hand," within two years from date of policy. Such statement was neither contradicted nor explained by plaintiff. *Held,* that the proof of such statement and admission in the "proofs of loss" shifted the burden of proof upon the plaintiff and, there being no contradiction or explanation of such statement, it was not error to direct a verdict against the plaintiff,

5. The expression, "died by his own hand," in a policy of insurance or proof of death thereunder, is equivalent to "suicide."

CIVIL ACTION, tried before *Boykin, J.*, and a jury, at April Term, 1896, of FRANKLIN Superior Court. The nature of the action and the facts are stated in the opinion of the court.

*Messrs. F. S. Spruill* and *C. M. Cooke & Son*, for plaintiff (appellant).

*Messrs. Battle & Mordecai* and *F. H. Busbee*, for defendant.

DOUGLAS, J. : This is an action by Mrs. Sarah F Spruill against the Northwestern Life Insurance Co. to recover the amount of a policy of insurance issued to her as beneficiary upon the life of her husband, William T. Spruill. The policy issued on the 2nd day of October, 1894, provided that if, within two years from the date thereof, "the said assured shall, *whether sane or insane,* die by his own hand, then this policy shall be null and void." The assured died on the 24th day of July, 1895, from the effects of a "pistol shot in his own hands," as stated in the proof of loss furnished to the defendant by the plaintiff, as required by the terms of the policy. The complaint, among other material allegations, alleged: "That on the 24th day of July, 1895, at and in the county of Nash, the said William T. Spruill

died," without stating in any manner the cause of his death. The answer of defendant company set up, as a complete defence against any recovery, the date and terms of the policy, and the date and manner of death of the assured, as above set forth. The court held that the burden of proof rested upon the defendant.

During the progress of the trial the plaintiff proposed to ask one W. T. Clark, her own witness, as to the mental condition of the assured at the time of the killing. The defendant objected, the objection was sustained and the plaintiff excepted. There is no error in the exclusion of such testimony, as in our view of the law, as applicable to policies like the one in suit, the mental condition of the assured at the time of the killing is entirely immaterial. It is well settled that under the old forms of life insurance policies, in which it was provided that the insurer should not be liable if the assured "committed suicide" or "died by his own hand," the policy was not vitiated when the assured was insane at the time of suicide. *Borradaile* v. *Hunter*, 5 Mann. & Gr., 668; *Life Insurance Co.* v. *Terry*, 15 Vall., 580; *Bigelow* v. *Berkshire Ins. Co.*, 93 U. S., 284, and a long line of decisions identical therewith in the large majority of the States.

In view of these decisions the insurance companies began to insert the words used in this policy, or words equivalent thereto. As the expressions "committed suicide" and "died by his own hands" were held synonymous, the words added thereto, "sane or insane," or "feloniously or otherwise," are regarded as equally synonymous and intended to protect the insurer from all liability where the assured committed suicide, whether sane or insane, and regardless of the degree of insanity.

After careful consideration, we are of opinion that such is the legal effect of the provisions of this policy. A policy

of insurance is a contract and should be construed like all other contracts in such a way as to carry out the manifest intention of the parties, unless some of its provisions, conditions or limitations are contrary to law or to public policy. It was clearly the intention of the policy of insurance in this case to protect the insurer from *all* liability for *any form* of *suicide*, and we do not see how such protective conditions are in any way in violation of law or of any settled rule of public policy. Nor is the liability of the insurer affected by the degree of insanity, the word "insane" implying every degree of unsoundness of mind.

The distinction drawn by some eminent authorities in cases of self-killing by an insane person, "whether his unsoundness of mind is such as to prevent him from understanding the physical nature and consequences of his act or only such as to prevent him, while foreseeing and premeditating its physical consequences, from understanding its moral nature and aspect," does not commend itself to our better judgment. It seems to belong rather to the domain of speculative pyschology than to the practical administration of the law.

The determination of that shadowy line between mental twilight and night, where the last faint rays of reason, resting for a moment on the horizon of the mind, fade away into utter darkness, is practically beyond the power of finite understanding, and, to the jury, would necessarily be a matter of mere speculation, depending more upon their sympathy than their judgment. Of course the above rule does not include death by accident or mistake, such as the accidental discharge of a pistol in the hands of the assured, or poison, or an overdose of medicine taken by mistake. There must be at least physically some suicidal intent, no matter how far removed from a responsible mental operation. We believe this rule to be in accordance with the

better line of decisions prevailing in the majority of courts. In the leading and well considered case of *De Gogorza* v. *Knickerbocker Life Insurance Co.*, 65 N. Y., 235, the court says: "We have therefore only to consider the interpretation to be given to the language of the contract of insurance, for no question is made but that it was fully understood and agreed to by both parties. It can scarcely be doubted that an insurer of the life of a person may by apt language guard himself from liability for all disasters if the exemption does not contravene public policy. He may provide that if the assured shall die of the small pox, or any other specific disease of the body, he would not be liable, and there appears to be no reason why he may not guard himself against liability if death results from any disease of the mind. Indeed, it is said by Rapallo, J., in *Van Zandt* v. *Insurance Co.*, 55 N. Y., 169, 'that no rational doubt can be entertained that a condition exempting the insurers from liability in case of the death of the assured by his own hand, whether sane or insane, would be valid if mutually agreed upon between the insurer and the insured,' and then in substance adds 'that if nothing is said with respect to insanity, the result is that a party does not die by his own hand' if his death happens from the involuntary act of a madman. This view of the question is but a very concise and accurate statement of the law as announced in cases previously adjudged. * * * The word 'insane' or 'insanity' ordinarily implies every degree of the unsoundness of mind, and in this case we assume that the assured was in the very last degree mad or insane, so that the mere act of self-destruction was wholly involuntary."

After reviewing some of the leading cases the court concludes: "We prefer to place our decision upon the ground that the words of the proviso in the policy before us, by plain rules of interpretation, exempt the insurer from lia-

bility.   That this language, in view of previous decisions, was inserted for such a purpose, cannot be doubted and that it was agreed to by both the insured and the insurer is not questioned, and that it is a provision allowed by law no one denies.   We are to say from these words what the parties must have intended, and we cannot properly say that additional words having no meaning were inserted in the contract, and if they mean anything it is just what the words commonly import, and that is, if death ensues from any physical movement of the hand or body of the assured, proceeding from a partial or total eclipse of the mind, the insurer goes free."

In *Scarth* v. *Life Society*, 75 Iowa, 346, the court says: "We think that the better rule, and the logical conclusion of all the above cases, is, that the condition in the policy was intended to include self-destruction, no matter what the mental condition of the insured was at the time of the act which caused the death.   Of course, the policy was never intended to include death by accident, as by taking poison by mistake, the accidental discharge of a gun or pistol held in the hands of the insured, or the like.   It means all suicidal acts, whether such as are demonstrated as criminal or such as are the offspring of insanity."   This construction appears to have been subsequently followed in the Supreme Court of the United States, as well as New York and the majority of the leading insurance States.   *Bigelow* v. *Insurance Co.*, *supra; Insurance Co.* v. *McConkey*, 127 U. S., 661; *Insurance Co.* v. *Akens*, 150 U. S., 468; *Riley* v. *Ins. Co.*, 25 Fed. Rep., 315; *Billings* v. *Ins. Co.*, 64 Vt., 78; *Chapman* v. *Ins. Co.*, 6 Bissell, 238; *Penfold* v. *Ins. Co.*, P. 85 N. Y., 318; *Adkins* v. *Ins. Co.*, 70 Mo., 27; *Pierce* v. *Ins. Co.*, 34 Wis., 389; *Life Asso.* v. *Payne*, (Texas), 32 S. W. Rep., 1066.

In *Connecticut Mutual Life Ins. Co.* v. *Akens, supra,*

the court, while affirming the judgment in favor of the plaintiff, distinctly recognized the principle herein adopted by the following distinction (p. 475): "The clause (then under construction) contains no such significant and decisive words as 'die by suicide, sane or insane' as in *Bigelow* v. *Berkshire, &c., supra,* or 'by suicide, felonious or otherwise, sane or insane' as in *Insurance Co.* v. *McConkey*, 127 U. S., 661."

In the case before us any possible hardship arising from the exclusion of all liability for death from suicide is met by the termination of this condition after the lapse of two years from the date of the policy, which then becomes incontestible. The question of the possible waiver of such a condition by the acceptance of premiums after the insured was wholly or partially insane, or threatened with insanity, is not before us.

The only exception remaining for us to consider is that of the plaintiff to the action of the trial judge in directing the jury to answer the issue in the affirmative. The only issue was as follows: "Did William T. Spruill die by his own hand within two years from the date of the policy sued on?" The force of this exception depends upon the consideration of several important principles. The action of the judge can be sustained only under the doctrine, firmly established in this State, that where there is no evidence, or a mere scintilla of evidence, or the evidence is not sufficient, in a just and reasonable view of it, to warrant an inference of any fact in issue, the court should not leave the issue to be passed upon by the jury, but should direct a verdict *against the party upon whom the burden of proof rests. Covington* v. *Newberger*, 99 N. C., 523, citing *Brown* v. *Kinsey*, 81 N. C., 245; *Best* v. *Frederick*, 84 N. C., 176; *State* v. *White*, 89 N. C., 462; *State* v. *Powell*, 94 N. C., 965. That the verdict should be directed *against*

the party on whom rests the burden of proof, is the essence of the rule. We have examined the large number of citations in the elaborate brief of the learned counsel for the defendant, and cannot find a single case of a direction to the contrary. In *Purifoy* v. *Railroad*, 108 N. C., 100, the direction was in favor of the defendant upon a counter claim as well as the original cause of action, but they both depended upon the same state of facts, and as there was *no conflict* in the testimony, the case practically resolved itself into mere questions of law. The doctrine under dicussion is of English origin and of comparatively recent acceptance in this State. The case of *Wittkowsky* v. *Wasson*, 71 N. C., 451, was apparently the first authoritative exposition of the doctrine as it now stands, although citing the case of *State* v. *Vinson*, 63 N. C., 335. The former case, emphasized by the qualified assent of Justice Reade and the unqualified dissent of Justice Bynum, cites with the warmest approval the following quotation from the opinion of Welles, J., delivered in the English Court of Exchequer Chamber, to wit: "There is in every case a preliminary question which is one of law, viz., whether there is any evidence on which the jury could properly find the question for the party on whom the *onus* of proof lies. If there is not, the judge ought to withdraw the question from the jury and direct a non-suit if the *onus* is on the plaintiff, or direct a verdict for the plaintiff if the *onus* is on the defendant. It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence, even a scintilla, in support of the case, but it is now settled that the question for the judge (subject, of course, to review is as stated by Maule, J., in *Jewell* v. *Parr*, 13 C. B., 916: 76 E. C. L. R., not whether there is literally no evidence, but whether there is none that ought reasonably to satisfy the jury that the fact sought to be proved is estalished." Reade, J.,

assenting, says: "I assented to the decision as delivered in the opinion of Brother Rodman, upon the explanation therein, that it was not to be interpreted as an innovation upon the established rule that the jury are the *sole* judges of the *weight* of evidence without any intimation of opinion on the part of the judge." The rule laid down in that opinion is now too firmly established to be questioned, but it can be carried no further without dangerously infringing upon constitutional provisions.

His Honor had already ruled that the burden of proof rested upon the defendant, and we think properly so. The presumption is always against suicide, as it is contrary to the general conduct of mankind. *Mallory* v. *Ins. Co.*, 47 N. Y., 54, cited and approved in *Insurance Co.* v. *McConkey, supra ; Insurance Co.* v. *Akens, supra.*

It is further held that where the words of a policy do not clearly indicate the intention of the parties, the courts should lean to that interpretation which is most favorable to the assured. McConkey's case, *supra*, citing a large number of cases.

If the verdict of a jury is in the opinion of the court against the weight of evidence, it can be set aside, and to the proper exercise of this discretion there can be no objection. But to permit the judge to pass upon the *sufficiency* of the evidence necessary to rebut a legal presumption without submission to the jury would infringe upon the exclusive powers of the jury. *Hardison* v. *Railroad*, at this term. The determination of the necessary character and legal effect of that evidence belongs to the court as a question of law, but its weight must be left with the jury as a matter of fact. *Wittkowsky* v. *Wasson, supra ; Best* v. *Frederick*, 84 N. C., 176; *State* v. *Powell*, 94 N. C., 965; *State* v. *McBryde*, 97 N. C., 393; *Powers* v. *Erwin*, 108 N. C., 522; *State* v. *Chancy*, 110 N. C., 507; *Young* v.

*Alford*, 118 N. C., 215, and numerous other cases. The rule laid down in some authorities that wherever the judge would be justified in setting aside the verdict as against the weight of evidence, he would be equally justified in taking the case from the jury and directing a verdict, cannot receive our sanction. It is not the law in North Carolina, and never can be under our present Constitution. "The ancient mode of trial by jury," guaranteed by the Constitution, is that at common law, and is none the less the right of the citizen than it was of the subject. Direction of a verdict and granting a new trial are essentially different in nature and effect. The one regulates the trial by jury, the other denies it; the one recommits the case to the jury, the other takes it away completely; the one merely reopens the case for a fairer trial, while the other ends it without redress, save the precarious method of appeal, where findings of fact can be reviewed only from the meager notes of the judge and the uncertain recollection of counsel. The mere fact that the judge can never, save by waiver or consent, *render* a verdict, but can direct it only in the name of the jury, shows the intent and spirit of the law.

These principles are "fundamental," and "a frequent recurrence" thereto is of constitutional obligation.

The issuing of the policy and the death of the assured, alleged in the complaint and admitted in the answer, made a *prima facie* case for the plaintiff. The *onus* was thus shifted by the pleadings to the defendant, and was assumed by it. After the conclusion of its oral testimony, the defendant read in evidence the proof of claim sent on to the defendant by the plaintiff, in which it was stated that the cause of death of the assured was "pistol shot from his own hand." This statement, unexplained, was an admission of suicide, and at once shifted the burden of proof upon the plaintiff. *Insurance Co.* v. *Newton*, 22 Wall.,

32; *Insurance Co.* v. *Higginbotham*, 95 U. S., 380. The cause of death as given, when unexplained, negatives the *accidental* discharge of the pistol, for the expression "died by his own hand," which, in its broadest sense, might include accidental death, has been uniformly given by the courts a well recognized meaning as being equivalent to "suicide." The plaintiff, though she went on the stand herself, in no wise contradicted this import of the words; nor did she testify to any facts tending to show she had used them by mistake or inadvertence. Her admission, unexplained and uncontradicted, justified his Honor's direction to the jury.

No error.