ROBERTA MANUFACTURING COMPANY v. ROYAL EXCHANGE ASSURANCE COMPANY.

(Filed 20 December, 1912.)

### 1. Insurance, Fire—Delivery—Intent.

The intent of the parties as to whether policies of fire insurance were to be valid and subsisting contracts between them will control the question of delivery, and their manual delivery to the insured, or to the parties authorized to represent him, is *Held* not to be essential in this case to make them binding upon the companies.

### 2. Same—Manual Delivery.

When a policy of fire insurance is placed by the insurer into the hands of the authorized agent of the insured, and nothing remains but to make delivery to him, without any further action on the part of the insured being necessary, except the mere formal act of receiving the policy, then the agent is presumed to hold the policy for the insured, and the contract is binding.

### 3. Insurance, Fire — Policy Contract — Principal and Agent — Renewals—Contracts—Acceptance.

A secretary of a manufacturing concern was also a partner in a local fire insurance agency designated as A, and as such obtained policies of insurance through his agency on the company's property, intending to substitute them for policies already issued and accepted in renewal by another agency, designated as B, and held the policies of agency A in his desk at the office of that agency, while endeavoring to get a better rate of insurance to meet that of agency B. In the meanwhile the property was destroyed by fire: *Held*, (1) the issuance of the policies by the agent, without the knowledge or consent of either party, was invalid; (2) it was necessary that the minds of the contracting parties agree in order to make a valid contract, and the policies of agency A being refused by the proper officer of the insured, superior to that of the secretary, and those in renewal of agency B being accepted by him, there was no valid contract which would put in force the policies of agency A, or make a binding contract on the companies represented by it.

### 4. Insurance — Policy Contracts—Consideration—Agreement as to Rates.

A contract is not enforcible if the contracting parties have not agreed upon the consideration to support it. Hence, when the subject of proposed insurance has been destroyed by fire

pending the question of the amount of the rate to be charged, the policies are not binding upon the proposed insurer.

**5. Insurance — Policy Contracts—Cancellation—Consent—Interpretation of Statutes.**

While it takes the agreement of the minds of both parties to make a contract, it may be terminated by one of them if the contract so provides; and under the provisions of our standard form of fire insurance policies, "this policy shall be canceled, at any time, at the request of the insured, etc." (Revisal, sec. 4760), the policy terminates at once, or is immediately canceled, upon the receipt by the insurer of the request of the insured to that effect, without the necessity for the consent of the insurer.

**6. Same—Words and Phrases.**

Our standard form of a policy of fire insurance provides, "This policy shall be canceled at any time, at the request of the insured, or by the company giving five days notice in writing of such cancellation." Revisal, sec. 4760: *Held*, either party to the contract may cancel the policies without the consent of the other, by following the provisions of the policy applicable; and *Held further*, that the expression in other forms of policies that the policy "may be canceled" is construed as reading, "shall be canceled."

**7. Insurance—Policy Contracts—Physical Cancellation—Interpretation of Statutes.**

When the insured requests cancellation of policies of fire insurance of the insurer upon the statutory or standard form (Revisal, sec. 4760), the cancellation takes effect upon the insurer's receiving the request, without formal or physical defacement of the policy.

**8. Insurance, Fire—Possession of Policy—Presumptions—Rebuttal —Appeal and Error.**

The *prima facie* case of the possession by the insured of insurance policies covering loss by fire does not control on this appeal, and little importance is attached to it, as the facts herein rebut the presumption.

APPEAL by defendant from *Lyon, J.*, at March Term, 1912, of MECKLENBURG.

This is an action to recover upon divers policies of insurance, eleven in number, alleged to have been issued by the defendants to the plaintiff on its property, which was destroyed by fire on 25 December, 1910. Five of these policies were alleged to have

been issued by the Royal Exchange Assurance Company and its four associates on 26 November, 1910, the said companies being, at the time, represented by C. N. G. Butt & Co., an insurance agency at Charlotte, N. C., and their policies have, by consent and for convenience, been called the "Charlotte policies," and will be so styled in the discussion of the case, and the other policies, called the "Concord policies," and hereinafter styled as such, were issued by the insurance agency of John K. Patterson & Co., at Concord, N. C. E. F. White of Concord was a member of the insurance firm of John K. Patterson & Co., and also secretary and treasurer of the Roberta Manufacturing Company, plaintiff in this case. John C. Rankin was its president and S. M. Robinson was a director, and had joint control and management of the plaintiff's affairs with John C. Rankin. At the request of White, policies to the amount of $40,000 were made out by John K. Patterson & Co., and afterwards other policies to the amount of $20,000 were similarly made out by them, and all of them handed to White, who placed them in the drawer of the desk which was in the office of Patterson & Co. Issues were submitted to the jury and answered as follows:

1. Were the Charlotte policies delivered to plaintiff by the Charlotte companies? Answer: Yes.

2. Were they accepted before the fire by plaintiff? Answer: Yes.

3. Had they been canceled at the time of the fire? Answer: No.

4. Were the Concord policies delivered to plaintiff by the Concord companies? Answer: Yes.

5. Were they accepted by plaintiff before the fire? Answer: Yes.

6. Was E. F. White plaintiff's secretary and treasurer and also agent of the Concord companies when the Concord policies were written? Answer: Yes.

7. Did he so continue up to and after the fire? Answer: Yes.

8. Are the Concord companies estopped from setting up as a defense White's double agency at the time said policies were issued or accepted? Answer: No.

9. Did the Concord companies by their conduct or course of dealing prior to the issuing of these policies authorize their agents to issue these policies to plaintiffs through White, and thereby waive their right to defend on the ground that said policies were invalid because White was agent of both insurer and insured? Answer: Yes.

10. Were the Concord policies in force at the time of the fire? Answer: Yes.

The Concord companies made a motion to strike out the verdict on the fourth, fifth, ninth, and tenth issues.

Plaintiff gave notice of a motion that, if any part of this motion was sustained, it would move to strike out the answers to the sixth, seventh, and eighth issues.

The court sustained the motion of the Concord companies, and struck out the findings of the jury on the fourth, fifth, ninth, and tenth issues, and, on motion of counsel for the Concord companies, dismissed the action, as to them, under the statute. It also overruled plaintiff's motion for judgment against all the defendants, set aside the findings against the Concord companies for insufficiency of evidence to sustain the same, as matter of law and not as matter of discretion, and refused a new trial to the Charlotte companies on their motion. Judgment was rendered for the plaintiff against the Charlotte companies for the full amount sued for, and in favor of the Concord companies, dismissing said action as to them, with costs against plaintiff. Plaintiff and the Charlotte companies appealed.

*Burwell & Cansler for plaintiff.*
*Tillett & Guthrie and A. C. King for Concord companies.*
*Osborne & Cocke and W. S. O'B. Robinson, Jr., for Charlotte companies.*

WALKER, J., after stating the case: The decisive question in this case is, whether the Concord policies were delivered so as to become effectual as insurance contracts. Counsel for the Charlotte companies virtually, or at least tacitly, conceded, as we think very properly, that the Charlotte policies had been accepted by the plaintiff and were in force at the time of the

fire which destroyed the insured property. If anything besides this frank admission were needed to show the fact, the letter of Mr. Griffith of the firm of C. N. G. Butt & Co. to S. M. Robinson, dated 17 December, 1910, and referring to the carbon copy of a letter from S. M. Robinson to E. F. White, dated 15 December, 1910, would be sufficient of itself to establish conclusively the delivery by C. N. G. Butt & Co. and the acceptance by the plaintiff of the Charlotte policies. In his letter, as we have said, Griffith refers to the inclosed carbon copy of Robinson's letter to White, in which Robinson, for himself and Rankin, and acting for the plaintiff, declines to accept the Concord policies, and notifies White to cancel them, "so as to leave the business in the hands of C. N. G. Butt & Co., where I find it rightly belongs." With reference to this statement, Griffith, in his letter to Robinson, approves what Robinson had said in his letter to White, in these words: "I have read with much interest the carbon copy of letter to Mr. White. I am glad you have taken the position you have and that you will let the insurance remain with us. I return herewith letter as requested, together with bill. If it is not convenient to pay now, we will take care of same."

With this matter out of the way, we turn our attention to the delivery of the Concord policies. We attach no great importance to the fact that they remained in the actual possession of White, that is, in the drawer of the desk, from the time he got them from Patterson & Co. to the day of the fire and afterwards, for if they were intended by the parties to be valid and subsisting contracts of insurance, the manual delivery of them to the plaintiff, or to the party authorized to represent it, was not essential to make them binding upon the companies. "In the absence of any other evidence to show assent of the company to the making of a contract of insurance, delivery of the policy must be shown. But where a policy has been duly executed in compliance with an application on the part of the insured, so that the minds of the parties have fully met as to the terms and conditions of the contract, a manual delivery of the policy to the insured is not essential to render it binding on the company." 19 Cyc., p. 603. If the policy has been put into

the hands of the company's agent, to be delivered to the insured, and nothing remains but to make such delivery, without any further action 'on the part of the insured being necessary except the mere formal act of receiving the policy, then their agent is presumed to hold the policy for the insured and the contract is complete and binding. *Insurance Co. v. Colt,* 20 Wall., 200 (22 L. Ed., 423); *Wheeler v. Insurance Co.,* 131 Mass., 1; *Dibble v. Assurance ·Co.,* 70 Mich., 1 (14 Am. St. Rep., 470); *Insurance Co. v. Meier,* 28 Neb., 124; *Morrison v. Insurance Co.,* 64 N. H., 137; *Hallock v. Insurance Co.,* 26 N. J. L., 268; *Machine Co. v. Insurance Co.,* 50 Ohio St., 549 (22 L. R. A., 768).

The fact that White had physical possession of the Concord policies, of course, throws light upon the other question, as to whether they had been issued by the Concord companies and accepted by the plaintiff. Our view of the case also eliminates another question, whether, if the Concord policies had been duly issued and accepted, the dual agency of White, who, in a measure, represented the plaintiff, and also the Concord companies, would have the effect of invalidating the policies. This brings us to consider whether the Concord policies had been delivered and were in force when the fire occurred. Looking at the entire evidence and considering it most favorably for the plaintiff, the indisputable facts of the case lead us irresistibly to the conclusion that there was no such delivery of the policies as the law requires to complete the contract of insurance and impose liability upon the companies.

It is, of course, true that a policy issued by an insurance agent, without the knowledge or consent of either party, is not valid. 19 Cyc., 625; *Insurance Co. v. Turnbull,* 86 Ky., 230. "To constitute any contract, there must be a proposal by one party and an acceptance by the other, resulting in an obligation resting upon one or both, or, in other words, there must be a promise." *Bailey v. Rutjes,* 86 N. C., at p. 520; Pollock on Contracts, 5. The property to be insured was worth $70,000. The Concord companies had before tried to get the insurance, but it was given to the Charlotte companies, C. N. G. Butt &

Co., their agents, having procured better rates than were offered by the Concord companies. The policies issued by the Charlotte agency were about to expire and renewals were issued and sent by C. N. G. Butt & Co. to the plaintiff. These policies, as we have seen, were accepted, and a controversy arose as to whether the plaintiff should keep them and continnue the insurance with the Charlotte companies, or accept the policies of the Concord companies. Whether this should be done was not left finally to the discretion or judgment of E. F. White, the agent at Concord, but to the final decision or approval of Robinson or Rankin, the former being higher in authority than White, and Rankin being in supreme authority. The whole evidence shows, without any doubt, that what Patterson and White did at Concord with reference to the policies did not effect insurance until submitted to Rankin, or to Robinson acting for him, and approved. The new insurance was to be substituted for that in the Charlotte companies, which was about to expire. It was not the purpose of the parties to over-insure the property or to doubly insure it, and John C. Rankin so testified. The evidence shows that the transaction between Patterson & Co. and White was merely preparatory to making an offer of the policies to Rankin, as the president and general manager of the plaintiff company, who had the final word, and whose superior authority White was bound to respect. It is perfectly apparent that White did not consider that he had effected insurance in the Concord companies, but that it all depended upon what Rankin would do in the matter. He was anxious to get the insurance for his companies, to be sure, because he had a pecuniary interest involved in the successful issue of the sharp competition started by him with C. N. G. Butt & Co. He endeavored to induce Robinson to return the Charlotte policies to C. N. G. Butt & Co. for cancellation, but this Robinson positively refused to do, stating in his letter that the plaintiff felt under obligations to Butt & Co. for what they had formerly done in the way of procuring insurance for it at a lower rate than White's company had offered, and rejecting the Concord policies, with a request that White have them can-

celed. Rankin united with Robinson in making this request. But this is not all. John K. Patterson, of the firm of Patterson & Co., testified that White had said to him that when the previous insurance expired he would try to get the insurance for their companies. He handed to him a bill from C. N. G. Butt & Co. for the premium on the renewal insurance for $60,-000, and they then found that they were "up against it," that is, that the insurance for the renewal period had been written by C. N. G. Butt & Co. and they were likely to lose the business. He also testified: "I suggested to Mr. White that he return the Butt & Co. bill to them and state that we had written the insurance from Concord. I also suggested to him that he take the matter up with Mr. Rankin at Lowell, N. C., and see if we could not deliver our policies. In a few days Mr. Rankin came over to Concord and had a talk with Mr. White in regard to the matter, in our office, in my presence. Mr. Rankin told Mr. White, in my presence, that he would like very much for us to have the insurance, all things being equal, but he was under obligations to Butt & Co., on account of a reduction in rate that he had gotten. That, all things being equal, he would like to let us have it, but under the circumstances he was under obligations to Butt & Co., and he would like to leave the business with them, unless we could give a better rate. By which I understood he meant that he would keep the Butt policies, and later on, if we could get a better rate, he would let us write it." There is no disagreement as to the authority of John C. Rankin in the premises, and being thus invested with plenary and overruling authority, what he said to White was a refusal to accept the Concord policies unless the rate of insurance was reduced, and an assertion that he would retain the Charlotte policies until it was. E. F. White testified that after the receipt of Rankin's letter of 23 December, 1910, that he turned to Patterson and said: "There is nothing to do but to cancel the (Concord) policies; that there is a letter from Mr. Rankin he could read, which explained itself; that it looked like we had lost out." Patterson testified that when he had reached the conclusion that he had lost the insurance, he would simply have "marked the policies 'Not Taken,' and returned them to the

companies." The testimony discloses, without conflict, that White never expected to get the insurance without the assent of Rankin or Robinson. He rejected a proposition of Patterson, when the crisis had arrived, to divide commissions with Butt & Co., and insisted, rather, that they should try for all the insurance exclusively, and expressed the belief that they would obtain it "in the long run." "I was thinking about getting insurance later on through Mr. Buxton," that is, through a different channel. The more we recite the evidence, the more clearly does it appear that the Concord policies were merely left with White by Patterson & Co., to be delivered when accepted by Rankin, or by the plaintiff through Rankin, who was authorized to act for it. Either Robinson or White could negotiate for the insurance, but subject only to the ratification of Rankin, as the acknowledged head of the company.

It can make no difference in the result, what was intended by either party, nor can the contract be changed or modified by what one of the parties may now say he intended. It all depends upon what was said and done at the time. If no contract was made then, it cannot be made now *post facto.* "A contract, express or implied, executed or executory, results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree." *Prince v. McRae,* 84 N. C., 674, citing *Brunhild v. Freeman,* 77 N. C., 128, and *Pendleton v. Jones,* 82 N. C., 249. See, also, *Bailey v. Rutjes,* 86 N. C., 517; *Lumber Co. v. Lumber Co.,* 137 N. C., 431; *Knitting Mills v. Guaranty Co.,* 137 N. C., 565. In *Lumber Co. v. Lumber Co., supra,* we said: "When the terms of an agreement are ascertained, its effect is determined by the law, and does not depend upon the uncertain or undisclosed notion or belief of either party." But even if the present expression of a former intention could be considered, it could not change the result, as it is evident the parties, by their letters, meant that the transaction should "stand" as it then was, or that everything should remain *in statu quo*—that is, the Charlotte policies should be in force and the others should "stand" upon the proposal of White to

Rankin to accept them in the place of the Charlotte policies, the condition of the substitution being that the rate should be reduced. Even in this aspect of the case, the Concord policies could not be effectually delivered until the condition precedent was performed. *Faunce v. Assurance Co.,* 101 Mass., 279; *Harnickell v. Insurance Co.,* 111 N. Y., 390 (2 L. R. A., O. S., 150); *Insurance Co. v. Wilson,* 187 U. S., 467. There are other facts that might well be considered with reference to this question of delivery. It appears conclusively that the premiums for the insurance under the Concord policies had not been agreed upon, as Rankin and Robinson had from the beginning insisted upon a lower rate than the one offered, and they never did agree to the higher rate. Their minds, therefore, had not met and agreed upon the same thing, as one of the essential elements, viz., the consideration, had not been fixed. So that, in this view, no contract was made. Patterson & Co., through White, had proffered the insurance on certain terms, which Rankin was unwilling to accept. He then received and kept the Charlotte policies, and the matter being in this shape, Rankin suggested, in his letter of 23 December, 1910, that it be kept in abeyance, as it was and without any change, until they could hear from the insurers represented by Patterson & Co. as to the lower rate. Rankin had rejected White's offer of the Concord policies, for Patterson testified: "Yes, it was my intention, when I delivered them to Mr. White, to make delivery to the plaintiff company, but we could not do it, as Mr. Rankin was in the office there, and we tried to deliver them to him and he would not take them." Rankin had the power to overrule White, who was acting in two inconsistent capacities, one of which involved his personal interests, which conflicted with those of the plaintiff. Rankin, then, not only had the authority to act and to reject the policies, but it was eminently proper for him to exercise it, as he did, under the circumstances, his sole purpose being to do what was best for his principal, without any personal advantage to shake the wavering balance.

But there is another view of the case equally as fatal to the contention that the Concord policies were in force at the time of the fire. These policies, if ever delivered and in force, were

161—7

of the standard form, that is, the form prescribed by the statute, Revisal, sec. 4760. The following is one of the provisions of each policy: "This policy shall be canceled, at any time, at the request of the insured, or by the company by giving five days notice of such cancellation." The standard form of policy originated, we believe, in the State of New York, and our form was substantially copied from the one in use there. The Court of Appeals of that State has construed the provision of the policy in regard to cancellation, which we have quoted, in the case of *C. P. Iron Co. v. Insurance Co.,* 127 N. Y., 608, and it was there decided that all that is required for a cancellation of a policy and the immediate termination of the insurance is a request from the insured to the insurer, which, if transmitted by the mail, must have been received by the insurer, but as soon as received the cancellation takes effect at once. The policy then under consideration used the words, "may be canceled," instead of the words, "shall be canceled," which are those to be found in the policies sued on in this case. The Court, however, said that the terminology was practically the same and that the words "may be canceled," being the language of the insurer in its policy (which was not of standard form), was employed for the benefit of the insured, and should, therefore, receive a liberal construction from the Court, and that, as thus used, it is not merely permissive, but imperative, and has the meaning of "must" or "shall." It, therefore, held that the assent of the insurer to the cancellation was not required, as the parties could, by consent, have canceled the policy without any such provision. It was also said that while it takes two to make a contract, one may end it, if the contract itself so provides. This is a self-evident proposition. The Court, in that case, concludes with these words: "No consent of the insurer is essential. No meeting of minds is required. No act on his part is necessary. The contract through the force of its own provisions is ended by the action of the insurer or insured only. (*Stone v. Franklin Fire Insurance Co.,* 105 N. Y., 543.) Although the language of the parties is at the 'request' of the assured in the one instance and on 'notice' to the assured in the other, we think that in both it is within the power of the

party desiring to end the contract to do so without either con-
sent or action on the part of the other. When the insured sur-
renders the policy and requests that it be canceled, he can do
no more. Unless that ends the contract, he is powerless to end
it, and the company, while able itself to hang on or let go, as it
wishes, can hold him against his will. An insolvent insurer,
by refusing to cancel, could prevent the insured from procur-
ing other insurance." In our case, the general agents, who
wrote the policies, retained them in their possession and kept
them under their control, in the desk of Patterson & Co., or a
desk in their office, and therefore no surrender of the policies
was possible or necessary. *Hillock v. Insurance Co.,* 54 Mich.,
531; 16 A. and E. (2 Ed.), 872. S. M. Robinson, in his letter
of 15 December, 1910, not only requested the cancellation of
the policies, but virtually directed or ordered that it should be
done. The language of the letter is clear and explicit and its
meaning unmistakable. It also appears therefrom that Rankin
concurred in making the request or order. And both Patterson
and White understood what the letter meant, that is, a per-
emptory order to cancel, for White said, "We have lost out,"
that is, Butt & Co. have secured the insurance exclusively, and
"there is nothing else to do but to cancel those Roberta poli-
cies. We both ought to be kicked for not notifying Butt & Co.
not to renew their policies." We see, therefore, that under the
statute and by the terms of the policy, the sole requirement to
effect cancellation is a request by the insured duly communi-
cated to the insurer, and no action on the part of the latter and
no formal or physical defacement of the policy is required. A
request thus made operates to cancel the policy, even if the in-
surer absolutely refuses to permit it to be done. 16 Am. and
Eng. Enc. (2 Ed.), 877. The Concord policies were, therefore,
canceled when the Robinson letter was received by White, and
if not, then when White received the letter of Butt & Co., dated
22 December, 1910. We do not think that Rankin's letter of
23 December, 1910, alters the situation. He manifestly did not
intend to revoke what he and Robinson had already done. He
was personally partial to White on account of their close busi-
ness relation, but he felt under an obligation to Butt & Co. be-

cause of former favors, which had been denied by the Concord companies. There was a conflict between the two thus raised, and Rankin decided it in favor of Butt & Co., and justly so. We attach no special importance to the *prima facie* case made by the introduction of the Concord policies in evidence by the plaintiff. The facts are all before us and the bare presumption, as thus raised by the law, vanishes when confronted by the real facts of the case. *Spruill v. Insurance Co.*, 120 N. C., 141; *Powell v. Insurance Co.*, 153 N. C., 124; *Agen v. Insurance Co.*, 105 Wis., 217; *Coffin v. Insurance Co.*, 127 Fed. Rep., 555; *Andrus v. Casualty Co.*, 98 N. W., 200.

Our conclusion, therefore, is that the judge was right in setting aside the issues as to the Concord companies and giving judgment for the full amount of the loss against the Charlotte companies. This affirms the judgment of the court in both appeals.

Plaintiff's appeal: Affirmed.

Charlotte companies' appeal: Affirmed.