G. W. DUGGER and W. L. BRYAN v. WESLEY McKESSON and
others, and JOHN E. BROWN, who defends as landlord.

*Probate—Evidence in Ejectment—Hearsay—Opinion—Record—
Secondary evidence of State Grants; Alteration of—When void
and when voidable—Judge's Charge; Exceptions to.*

1. Before the change in our judicial system, all the Judges of the State
   had the power to take the probate and order the registration of
   deeds.

2. The testimony of one who assisted a surveyor, since deceased, in the
   survey of certain old grants from the State, as to a marked line
   which was pointed out, and the courses taken from a point in that
   line, is not rendered incompetent by the fact that an agent of the
   grantee was present at the survey.

3. Objection to the testimony of one appointed to survey the lands in
   controversy, showing how the calls in a grant were inconsistent
   with a plat attached to it, comes too late after the cross-examina-
   tion by the party objecting.

100—1

4. And when such testimony, offered by a defendant claiming under the grant, served to show discrepancies between the plat attached and the land to which he is attempting to fit it, the plaintiff, *it seems,* can have no ground to complain of the evidence.

5. Where the grants for large bodies of land contain no reference to streams claimed to be within their boundaries, it is admissible to prove by an experienced surveyor that the surveys for such grants are frequently silent as to the streams, when *not lines or termini,* or lay them down inaccurately.

6. The opinion of such surveyor is admissible to show why all the marks on trees along a line of a grant were on the north east side, instead of on opposite sides, so as to show the exact course of the line.

7. A call of a grant, dated July 20th, 1796, for 59,000 acres, being " north 24° east 3,098 poles by the Washington County line to a white oak," and the party offering the grant proposing to show that the tract was properly laid down on the line of that County by the act of 1789, ceding the County and the State of Tennessee to the United States, and offering for this purpose the act of cession, the act appointing commissioners to run the lines in 1796, a resolution of Assembly of December, 1799, ratifying their report, proof of the loss of the report, depositions of witnesses, accompanied by a book containing notes alleged to be the field notes of the surveyors who ran the lines for the commissioners in 1799—the depositions showing that the field notes were in the handwriting of one of those surveyors and were in the custody of the son of another, and their accuracy in calling for the State line, by actual survey and knowledge of one of them—and declarations of deceased persons in respect to the proceedings of the commissioners and their surveyors ; *Held,* that there was sufficient evidence of the authenticity of the record of the surveys to permit the *field* notes to be read in evidence ; and that running the State line as the boundary in the grant, was a recognition of the location of the grant by the grantor, the State.

8. Evidence that there is a large number of persons settled within the boundaries of two grants issued in 1796, of 59,000 and 99,000 acres respectively, is admissible to repel the idea that the lands so occupied were vacant, and liable to entry in 1881.

9. The alteration of a course in a grant after its issue, does not revest the land in the State, but it is operative in its original form—there being a distinction in this respect between executed and executory contracts.

DUGGER *v.* McKESSON.

10. While grants for land not subject to entry are void, and the fact may be shown on the trial of title to the land, a grant irregularly sued out cannot be avoided in a suit between parties claiming the land, but may be annulled by proper proceedings instituted by the State.

11. Errors in a Judge's charge must be pointed out specifically, and they will not be searched for in an entire charge, under an exception " to the charge as given."

ACTION for the recovery of land, begun in MITCHELL County, and removed to the Superior Court of CATAWBA, where it was tried before *MacRae, J*, at Fall Term, 1888.

The verdict and judgment were for the defendants and the plaintiffs appealed.

The facts sufficiently appear in the opinion.

*Mr. J. F. Morphew* and *Mr. J. M. Gudger*, for the plaintiffs.
*Mr. P. J. Sinclair* and *Mr. G. N. Folk*, for the defendants.

SMITH, C. J.  The plaintiffs' claim of title to the land sued for, and described in the complaint, is derived under a grant of six hundred and forty acres, made, on February 2d, 1881, to J. F. Amos, and a deed from the latter, and his wife, executed, on the 30th day of the next month, to the plaintiffs. The defendants, all of whom originally served with process, were acting by authority of John E. Brown, subsequently admitted to defend as landlord, and claiming to be the owner, concede that they are in the occupation of the same tract, and aver that the title thereto was not in the State when the grant issued to the plaintiffs' bargainor, but had, long before, to-wit: on July 20th, 1796, been divested out of the State by a grant to William Cathcart, of a tract of fifty-nine thousand acres, of which that, now in dispute, formed an inconsiderable part.

The essential matter in controversy is, as to the location of the boundaries of the land contained in the earlier grant, and the estate in which is claimed by the defendant Brown.

The issues, eliminated from the pleadings, and submitted to the jury, were, with the responses, as follows:

1. Are the plaintiffs the owners, and entitled to the possession of the lands described in the complaint? Answer. No.

2. Do the defendants wrongfully withhold possession of said lands from plaintiffs? Answer. No.

The response to the inquiry of damages was rendered unnecessary by the other findings, and none was returned.

The defendants offered, on the trial, in support of the claim of title in the defendant Brown:

1. A grant of sixteen thousand acres, issued to William Cathcart, on July 20th, 1796.

2. A grant, of same date, to William Cathcart, of eight thousand seven hundred and sixty acres.

3. A grant to him, of same date, of ninety-nine thousand acres.

4. A grant to same, and of same date, for fifty-nine thousand acres.

5. A grant, issued on July 8th, 1796, to Samuel Meeker and Alexander Cochran, for twenty-two thousand acres.

6. A transcript of proceedings in the Court of Equity of Buncombe County, for partition among the heirs of William Cathcart, in 1848 and 1849.

7. A sale and conveyance by deed of I. B. Sawyer, Clerk and Master in Equity, to W. J. Brown, executed on March 10th, 1853.

8. A deed for the same lands, made on June 27th, 1883, by said W. J. Brown to John E. Brown, the defendant admitted into the action at Spring Term, 1883, and before the removal.

It was admitted, that the deeds embrace the same lands as those described in the grant to Cathcart. Much evidence was introduced on each side, and many depositions read in the defence, of aged persons, as to declarations of old and

deceased persons, of the position of natural objects, and names, acquired by reputation, of certain localities, with a view to ascertain the boundaries of the Cathcart grants, of which so much only, is set out in the case on appeal, as will render intelligible the errors assigned by the plaintiffs and intended for revision.

Exception 1. An objection was made to the form of probate of the deed of the Clerk and Master when it was produced, but as the probate is not set out, nor is it shown wherein the alleged defect consists, the exception cannot be entertained. If it be, as the brief of counsel for the appellees state, a want of power in the Judge to take the probate, and order the registration, it is expressly sanctioned by the law in force before the change in the judicial system. Rev. Stat., chap. 37, sec. 1.

Ex. 2. One Wiseman, a witness for defendants, in his examination as to the location of the 90,000 and 59,000 acres granted, was allowed, after objection, to say: "When I was a boy, I was called on by John Brown to go with one Blackstock, a surveyor, from Buncombe, and went to a place called Davenport Spring, on Toe River," where was found a white oak, line marked, near to the spring, and the witness testified to the courses taken from that point. It does not appear, that Brown pointed out the tree, or made any remark in regard to these objects, but he was, at the time, the general land agent of Cathcart, and this fact, it was claimed, rendered inadmissible, as evidence, what occurred in his presence. We are unable to see how evidence, otherwise free from objection, is rendered incompetent by reason of the presence of the agent. What was said and done, proceeded from the surveyor, a disinterested person, and was admissible upon his death, in accordance with repeated adjudications in questions of ancient boundaries. *Caldwell* v. *Neely,* 81 N. C., 114; *Huffman* v. *Walker,* 83 N. C., 411; *Strickland* v. *Draughn,* 88 N. C., 315.

This is so when the declarant was at the time a slave, disabled to testify, inasmuch as, if living at the trial, he would have been heard.   *Whitehurst* v. *Pettipher*, 87 N. C., 179.

Ex. 3.—C. W. Watkins, who surveyed the lands and made the plats in the action, under an order of the Court, was examined at great length upon the boundary lines laid down by him, and testified in regard to the 99,000 acre tract, that one of its calls for the line of the Meeker and Cochran grant would never reach it, if the course was followed, and in pursuing it the tract of 99,000 acres would cut it in two; and he spoke of errors in the diagram attached to the grant, which, according to his testimony, did not pursue the calls in the grant itself, though professing to do so.

He testified further, that Toe River and the mouth of Plum Tree are placed upon the original plat differently from their location on his own, and that the survey covers land, judging from the streams, inside of the 59,000 acre grant.

After the testimony had been heard and the cross-examination ended, but before the re-direct examination was concluded, plaintiffs' counsel asked that all the foregoing evidence, offered for the apparent purpose of correcting the original plat, be withdrawn from the consideration of the jury.   The motion was denied, for that, if tenable, the objection came too late.

This application is not of right, but was addressed to the discretion of the presiding Judge, and his ruling is conclusive upon the reviewing Court.   *State* v. *Efler*, 85 N. C., 585; *State* v. *Pratt*, 88 N. C., 639.

We do not mean to say that, if made in apt time, the objection to the evidence would prevail, for it seems to conduce to a more intelligent apprehension of the controversy, to put the jury in possession of all the discrepancies between the plat and the locality to which it is attempted to be fitted, which seem to affect unfavorably the defendants' case, and

not that of the plaintiffs, so far as it has any, and therefore furnishes no ground of complaint from them.

Ex. 4.—The grants were noted for the absence of reference to streams within their boundaries, and the defendants proposed to inquire of the witness, as an experienced surveyor and familiar with the subject, whether, in laying down the lines in old grants, the surveys were careful to give them an accurate position when not called for as termini or crossings. The answer, after objection taken and overruled, was: "They may be correct or incorrect. Where they are not called for, I do not think they are usually laid down at all. I have seen them very inaccurate."

The ruling is correct, for the usage among old surveyors, derived from personal examination of them by a surveyor, himself acquainted with the territory over which they extend, tends to account for error in the position of natural objects, which, not forming a part of the description of the lines, seem not to have been carefully observed. The fact may be of little significance in determining the location of the grant, but as furnishing some aid thereto, it was properly made known to the jury.

Ex. 5—Another surveyor, Bright, admitted to be an expert, had testified as to an alleged boundary of the 8,700 acre tract on the north ; that all the marked trees found on the line bore marks on the northeast side, about the same position every time. He was then asked by defendants' counsel to explain why, in his opinion, the marks were put on the north side of the trees, variant from the direction in which the line ran. The plaintiffs objected, but the answer was received, and the witness said, that, in his opinion, it was to protect the marks from the effect of the sun, and they would remain longer on the north than on the south side of the tree.

We think the explanation was entirely proper, and that inexperienced jurors were entitled to know why the marks

were not on opposite sides of the trees, so as to show the course of the line they were put there to designate, and thus an error be avoided.

Ex. 6—The 25th call of the 59,000 acre grant being "north 24° east 3,098 poles by the Washington County line to a white oak," the defendants proposed to show that the tract was properly laid down on the line of that county, as defined by the act of cession, in which the county and the State of Tennessee were ceded to the United States, and that this line ran a direct course from the Yellow Mountain to the point on the Stone Mountain at a place where the Watauga river breaks through; that the distance between these points is fourteen miles, and the course north 24° east, and that the line of the 59,000 tract, surveyed in 1799, ran a direct course for nine or ten miles with the Washington County line, as established in the ceding act; and, further, that this line, as thus fixed, was capable of being made certain by the provision in the act at the time of the entry of that tract in 1796, under a survey, and that the line and course, as surveyed, is identical with that run and adopted by the State, through the commissioners appointed to survey and locate the lines of the Western lands, transferred to the United States, pursuant to said act of cession.

For this purpose the defendants offered in evidence:

1. The act of cession aforesaid, found in 1st Martin's Collection, ch. 299, and in 2 Rev. Stat., at page 171.

2 The act appointing commissioners to run the lines in 1796. 1st Mart. Coll., ch. 461.

3. A joint resolution of the General Assembly of December 4th, 1799, ratifying the commissioners' report.

4. The affidavit of the Chief Clerk in the office of the Secretary of State of his search for, and inability to find, the report of the commissioners, with the survey, accepted as evidence in the cause.

5. The report of commissioner J. M. Gudger, employed to

ascertain and fix the boundary between this State and Tennessee, a document of the General Assembly of 1887.

6. The depositions of E. Clayton and R. B. Justice, with the book containing the field notes of John Strother and Robert Henry, alleged to be the surveyors who ran the line for the commissioners in 1799.

The plaintiffs objected to the reception of the field notes as evidence, on the ground:

1. The want of proof of their being contemporaneous entries, and

2. For that the survey took place in 1799, after the issue of the grant to Cathcart in 1796.

The depositions of E. Clayton and R. B. Justice identify the book, which is transmitted, with the record, to this Court, as containing the field notes, by which the State line was run in 1799, defining the boundary of the ceded territory as being in the handwriting of John Strother, one of the surveyors employed to run and ascertain the line, and it came from the custody of the late Judge J. L. Henry, whose father, Robert Henry, was also one of the surveyors engaged in surveying the line for the commissioners, Joseph Mc-Dowell, D. Vance and Mussendine Mathews, and its accuracy in calling for the State line is verified by the deponent Justice, from actual surveys and personal knowledge, thus acquired by himself. Testimony was given of declarations of deceased persons to the witnesses in respect to the proceedings by the commissioners and surveyors, which was not at the time objected to, but was afterwards.

We think the authenticity of the record of the surveys, then made and forming part of the survey itself, sufficiently established, to be read in evidence, the original report thereof being shown to have been lost.

The second reason assigned for rejecting the evidence, is alike untenable. The running the State dividing line, as the boundary in the grant, is a recognition of the location of

the grant, coming from the grantor who, alone, has an interest in the lands, and an inducement to narrow, rather than enlarge, the limits, and is evidence of reputation, as to where they lie. Such evidence is admitted as hearsay, when coming from disinterested and deceased persons, and when called for in a junior grant. *Dobson* v. *Finley*, 8 Jones, 495; *Bethea* v. *Byrd*, 95 N. C., 309; *Halstead* v. *Mullen*, 93 N. C., 252.

Ex. 7. The plaintiffs also objected to proof offered, that there are settled, upon the 59,000 and 90,000 acre tracts, a large number of persons, perhaps as many as 400 or 500. The evidence was pertinent, as tending to repel the idea, that the lands, so occupied, were vacant, and subject to entry, in 1881, when the grant, under which the plaintiffs claim, was issued. The presence of the county town of Mitchell within the 99,000 acre tract, is hardly reconcilable with a supposed vacancy, or of a grant void for indefiniteness of description of the area enclosed.

Ex. 8. This exception rests upon an alleged unauthorized change in the 26th call of the 59,000 acre grant, since its issue, from "South 17° east to" South 30° east.

To support the plaintiffs' contention, they produced a certified copy of the grant, from which, it appeared that this call, in the body of the instrument, was for 17 degrees, and in figures, on the margin, 30 degrees. The defendants exhibited the original grant, and the disputed call, being in "the crease of the fold," and the paper much worn, it was uncertain what the true reading was, and conflicting evidence was offered, by the respective parties, upon the question of an alteration.

The Judge, upon inspection, held it to be 30 degrees.

But there was also testimony tending to show, that, however read, the effect, so far as the land claimed by the plaintiffs was concerned, would be the same, and either running would take in the plaintiffs' grant. If, in fact, the change was made in the terms of the grant after its issue, it would

not reinstate the title in the State, but it would operate still in the original form to vest the estate in the grantee.

Destroying a deed has no legal force in restoring the estate after it passes out of the grantor and vests in the grantee, and the case bears no resemblance to the effect produced upon an executory agreement. The distinction is between a contract executed and passing an estate, and a contract executory and to be enforced against one by a spoliator, to which the Court will refuse to lend its aid.

The plaintiffs asked for a series of instructions, of which the 1st, 2d and 5th were given in very words; the 2d, with additions set out in the charge, and the 4th and 6th, denied. Those refused are as follows:

4. If the grant of the 59,000 acre tract has been altered by the defendants in the 26th call, so as to substitute 30 degrees in place of 17, the grant thereby becomes void, and the jury must determine how that is from the evidence.

6. The grant is void, because, upon the plat of the survey attached, it appears that no survey was ever made by one having authority to survey and locate entries.

The first of the refused instructions, numbered 4 in the series, has already been considered and disposed of; the last only remains.

While grants of land, the entry of which is forbidden by law, are void, and the fact may be shown on the trial of title thereto, as in case of the Indian reservations, and "vacant lands," as defined in *State* v. *Bevers*, 86 N. C., 588, and others not subject to entry, as held in *Strother* v. *Cathey*, 1 Murph., 162, and in *Stanmire* v. *Powell*, 13 Ired., 312, it is as well settled, that for irregularities in suing out a grant, it cannot be avoided in an action between parties, but must be vacated in proper proceedings, instituted by the State, to revoke the issue and annul the deed. *Waugh* v. *Richardson*, 8 Ired., 470; *Stanmire* v. *Powell*, *supra*, and other cases.

The rulings are to the same effect in *Lovinggood* v. *Burgess*,

Busb., 407; *McCormick* v. *Monroe*, 1 Jones, 13, and *Harshaw* v. *Taylor*, 3 Jones, 513.

The charge of the Court, which shows familiarity with all the matters in controversy arising in the protracted trial, and is full and explicit, we give entire:

" The general principle upon which we try cases of this kind, is, that the plaintiff must recover on the strength of his own title, and not upon the weakness of that of his adversary, and the burden is upon the plaintiff to prove his case; but in this case the burden, upon the question of location, has shifted.

The plaintiffs, Dugger & Bryan, bring their action to recover of the defendants, McKesson and others, a certain tract of land in Mitchell County; and John E. Brown comes in and makes himself a defendant, and undertakes to defend the suit, as landlord, for all of his co-defendants. The plaintiffs show, in evidence, a grant to J. F. Amos for 640 acres in February, 1881, and a deed from Amos and wife in March, 1881, to them, the plaintiffs.

The defendants admit that the land in dispute, the 640 acres, is properly located on the plat, and is covered by the grant and deed shown by plaintiffs.

The plaintiffs, having shown title out of the State and in themselves for the land, are entitled to recover, unless the defendants can show the right to the possession, which they admit they hold, under a better title than that of the plaintiffs. The issues are: First, are the plaintiffs entitled to the possession of the land described in the complaint? The plaintiffs having shown title, insist that it is upon the defendants now to satisfy you, by a preponderance of evidence, that they have a better title. They offer, in evidence, a grant to Wm. Cathcart, dated July 30th, 1796, and the plat and survey accompany the same, which you have a right to consider in determining the location for 59,000 acres, and they also offer you evidence of a succession of conveyances of this land by

which it comes to defendant Brown, under whom all the other defendants claim.  Now, the question is, have the defendants satisfied you that this 59,000 acre grant covers the 640 acre tract, for which plaintiffs are prosecuting this action ?  If they have located it so as to include within its boundaries this 640 acre tract, they have shown an older, and, therefore, a better, title to the land than plaintiffs, and your response to the issue should be, No, the plaintiffs are not the owners.  But if they have failed to convince you of the fact, the burden being upon them, you should answer, Yes, the plaintiffs are the owners, etc.  Most of the testimony offered on each side has been directed to the question of the location of the. boundaries of the 59,000 acre tract, and in order to properly locate it, the defendants have offered in evidence several other grants to the same party, Wm. Cathcart, and one to Meeker and Cochran for large bodies of land, which, they say, will aid you in your investigation, and enable you to determine whether the 59,000 acre tract has been properly located by defendants.  They have, also, called your attention to the many acts of Assembly, establishing counties in the northwestern section of the State, to the act of 1789, by which a very large portion of territory was ceded to the United States, out of which the State of Tennessee was subsequently formed.  It is a very interesting chapter of history which has been brought to our attention, and we cannot fail to have obtained much information as to the early settlement of this section, and the manner of disposition of the land belonging to the State in those early days of its existence.  They have offered you evidence of the establishing of the County of Burke in 1777 from the older County of Rowan, and of the boundaries of Burke at its formation, also of Wilkes and of Washington, which were erected at the same session with Burke, and of subsequent acts fixing their boundaries.  The 59,000 acre tract, as described in the grant, is in Burke County.  The begin-

ning corner is said to be a white oak, standing on what is supposed to be the line of Wilkes County, and the last call of the grant is from a black oak So., 45° W., 2,040 perches, along the line of Wilkes County, to the beginning. Unless the 59,000 acre tract, or a part of it, is in the boundaries of Burke County, as it then was, the grant is then void and of no effect, but if part of the land granted is in Burke, the grant is not void, by reason of part of it being outside of the old boundaries of Burke. Have they located the beginning corner of the tract? In order to locate a tract of land, it is not necessary that the surveyor should begin his survey at the beginning corner; he may begin at any point which can be satisfactorily established, and when one point has been settled upon, he may fix the other, if he can. The Washington County line has also been called for as one of the lines of the tract. Have the defendants satisfied you of the location of this line, and of the point near which the Washington and Wilkes lines intersect? One call is for the line of Washington County; this line of the grant must go to the Washington County line, if it can be found, the line of Washington County as it was in 1796, and whether it had been surveyed or not, at the date of this grant, makes no difference, if it was afterwards run in accordance with an act theretofore passed, ascertaining where the Washington County line was; therefore I have admitted in evidence the notes of the surveyor who ran the State line in 1799, in accordance with the act of cession made in 1789, in order that you may determine whether this location, as contended for by the defendants, is the correct one, and has reached the Washington County line.

The defendants, for the purpose of satisfying you of the proper location of the 59,000 acres, have offered evidence tending to show the location of the four or five other tracts, and the same rules will apply to the location of each tract as applies to the 59,000 acre tract. The number of acres

called for in a grant is not always very material, for the boundaries will control, and if they are correctly ascertained, the grantee is entitled to all within them, and not excepted, whether the number be greater or less than that stated in the grants, but, in ascertaining the situation of doubtful boundaries, the number of acres stated in the grant may be considered.

Courses and distances are controlled by a call for known objects or established lines. If the lines of 99,000 acres have been located to your satisfaction, and there is a call in the 59,000 acre grant from a point which has been located to and with the line of the 99,000 acres, you must go to it with this line regardless of course and distance, but if the 99,000 acres cannot be found, you must follow the course and distance of the 59,000 acre grant. Where lines of other tracts or counties, or State lines, are called for, which were known at the time of the grant, then the true boundary is such lines so called for, but if at the time of the issuing of the grant such lines were not run and marked, then the jury are at liberty to locate such lines according to the calls or points designated, without reference to any subsequently marked line, unless they have been satisfied that such subsequently marked line was run in accordance with the act or grant establishing the line. If they are satisfied that the subsequent survey reached the true location, they will be governed by it. These general directions will apply to the location of each of the tracts which the defendants have undertaken to locate to your satisfaction. The contention of defendants is, that all of these grants, made on the same day, were a series of grants calling for each other, and that the Meeker & Cochran grant, issued a few days before the others, is also called for in some of these grants, and they say that if they have satisfied you of the location of each of these different tracts, and that they correspond with each other, that they will materially assist you in arriving at

your conclusion whether the defendants have properly located their 59,000 acres so as to include the land in dispute. And so, if they have failed to locate the other grants, the plaintiffs contend that as the location of the 59,000 acres is so intimately connected with that of the others, they have failed to locate the 59,000 acres.

The copies of the survey and of the grants of the 59,000 acre tract were admitted, to enable you to see whether there has been an interlineation or erasure in the body of the grant, changing the 26th call from So. 17° E. to So. 30° E.

It matters. not what interlineations are made in the surveyor's plat and description. The question for you is, Has that call been changed in the grant since it was issued; and if so, what is the effect of it? If it has been changed since it was issued, would it affect the location of the tract to the prejudice of plaintiffs? For, unless the effect of the alteration, if there has been any alteration, would be to include the land claimed by plaintiff, when otherwise by the grant, as it was originally issued, it would not have done so, it would make no difference. I don't think an alteration would make void the grant; it would only, in this case, impose upon you the task of ascertaining what were the original calls of the grant, and whether, as it was written, it includes the boundaries of plaintiffs' claim, the land in dispute. But to prove an alteration, the burden, as entered upon the plaintiffs' authority, must satisfy you of its truth by a preponderance of evidence.

The response to the second issue will follow the response to the first. If you respond Yes, to the first, or No, to the first, make the same response to the second.

The third issue is as to damages. If you have found the first and second issues in favor of the plaintiffs, the only testimony to damages is that of plaintiff Dugger, who testifies that it was more than $200, but they claim no more than

that sum.  But if you have answered the first and second issues No, you need not trouble yourselves about the third.

The plaintiff "excepted to the charge, because of the charge as given, and because of the failure of the Judge to give the charge as requested in the plaintiffs' prayer for special instructions."  The jury rendered a verdict in response to the first and second issues, No.

We reproduce the instructions, as given, at large, in order to show their fairness, and the correct exposition made of the law by the able Judge who presided and conducted the trial, of which no better evidence can be furnished than the failure of the appellants to point out any specific error in it. We cannot entertain an exception, that, failing to do this, is taken " to the charge as given."  Errors must be pointed out, or they will not be searched for in an entire charge, under general words, such as are here used.

There is no error and the judgment is affirmed.

Affirmed.