PETERSON et al. v. SUCRO.

No. 4384.

Circuit Court of Appeals, Fourth Circuit.

Jan. 19, 1939.

W. A. Worth, of Elizabeth City, N. C., and W. D. Pruden, of Edenton, N. C. (Worth & Horner, of Elizabeth City, N. C., on the brief), for appellants.

P. W. McMullan, of Elizabeth City, N. C. (John H. Hall, of Elizabeth City, N. C., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and H. H. WATKINS, District Judge.

H. H. WATKINS, District Judge.

This action for the trial of title to land was instituted by appellee against appellants, who were therein and will be hereinafter respectively designated as plaintiff and defendants. The case was docketed at law and tried as an action in ejectment pursuant to the North Carolina practice. This is the second appeal. Upon the first trial defendants demanded that the case be submitted to a jury, but this was refused and the case referred to a special master, upon whose report the court rendered judgment in favor of the plaintiff. Appeal was taken upon several grounds, but the judgment was reversed solely upon the ground that the court committed error in refusing defendants' demand for a jury trial. Peterson et al. v. Sucro, 93 F.2d 878, 114 A.L. R. 890. Upon the second trial, which was had before a jury, the court directed a verdict in favor of the plaintiff, from which this appeal is taken.

Counsel for defendants first of all make the point that this direction of verdict was in violation of the former decision of the court in this case, their contention being that that decision not only became the law of the case, but required the actual submission of the cause to a jury without peremptory instruction. In support of this contention they cite the following authorities: Ferrell v. Metropolitan, 207 N.C. 51, 175 S.E. 692; Ferrell v. Metropolitan, 208 N.C. 420, 181 S.E. 327; Herr v. St. Louis & S. F. R. Co., 5 Cir., 174 F. 938; St. Louis & S. F. R. Co. v. Herr, 5 Cir., 193 F. 950. These cases, however, are easily distinguished from the instant case. The error complained of and for which the appeal in the instant case was sustained was the court's failure to grant to the defendants *the right* of a trial by jury. Instead of this, they were met at the beginning of the trial with the court's refusal to impanel a jury and to conduct the case as a jury trial. The error upon which the reversal was based was committed before any testimony was taken or offered and, therefore, had no reference to the sufficiency of the testimony. The decision must have been the same in that appeal whatever the testimony offered or even if none had been taken. A substantial right had been violated and it was the denial of this right that was passed upon. Furthermore, the language of the courts in the cases above referred to, and relied on by defendants, clearly indicated

that the evidence at the second trial in each of the cases was substantially the same as in the first.

■■■ There is a long line of cases by the Supreme Court of North Carolina to the effect that although on a motion for a nonsuit, or a directed verdict, the opposing evidence must be accepted as true, and every reasonable inference to be derived therefrom accepted in opponents. favor, nevertheless, where evidence does no more than raise a conjecture or supposition of a fact alleged, the case should not be submitted to a jury. Circumstances which raise a mere possibility or conjecture, unless sustained by other evidence, should not be left to the jury as evidence of a fact which a party is required to prove. Whittington v. Va. Iron, Coal & Coke Co., 179 N.C. 647, 103 S.E. 395; Seagroves v. City of Winston, 167 N.C. 206, 83 S.E. 251; Poovey v. International Sugar Feed No. 2 Co., 191 N.C. 722, 133 S.E. 12. In the last mentioned case the court said [page 14]: " 'The rule is well settled that if there be no evidence, or if the evidence be so slight as not reasonably to warrant the inference of the fact in issue or furnish more than materials for a mere conjecture, the court will not leave the issue to be passed on by the jury.' * * * This rule is both just and sound. Any other interpretation of the law would unloose a jury to wander aimlessly in the fields of speculation." The court cited Brown v. Kinsey, 81 N.C. 245; Crescent Liquor Co. v. Johnson, Vaughan & Co., 161 N.C. 74, 77, 76 S.E. 625; State v. Prince, 182 N.C. 788, 790, 108 S.E. 330; Swann v. Martin, 191 N.C. 404, 132 S.E. 16. In Spruill v. Northwestern Mutual Life Ins. Co., 120 N.C. 141, 27 S.E. 39, the trial judge directed the jury to answer in the affirmative a question decisive of the case. The court held therein that the doctrine had been firmly established in North Carolina that where there is no evidence, or a mere scintilla of evidence, or the evidence is not sufficient in a just and reasonable view of it to warrant an inference of any fact in issue, the court should not leave the issue to be passed upon by the jury, but should direct a verdict against the party upon whom the burden of proof rests. The court said that in every case there is a preliminary question, which is one of law, for the court to ascertain, to-wit, whether there is any evidence on which the jury could properly find the question for the party on whom the onus of proof lies, and added [page 42]: "If there is not, the judge ought to withdraw the question from the jury and direct a nonsuit if the onus is on the plaintiff, or direct a verdict for the plaintiff if the onus is on the defendant. It was formerly considered necessary in all cases to leave the question to the jury if there was any evidence, even a scintilla, in support of the case; but it is now well settled that the question for the judge (subject, of course, to review) is, as stated by Maule, J., in Jewell v. Parr, 13 C.B. 916, not whether there is literally no evidence, but whether there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established." In the case of Crescent Liquor Co. v. Johnson, Vaughan & Co., supra, the question was discussed at some length by the court with citation of numerous authorities. The court said [page 626]: "However confidently one, in his own affairs, may base his judgment on mere probability as to a past event, when he assumes the burden of establishing such event as a proposition of fact and as a basis for the judgment of a court, he must adduce evidence other than a majority of chances that the fact to be proved does exist. It must be more than sufficient for a mere guess, and must be such as tends to actual proof." To the same effect is the case of Brown v. King, 107 N.C. 313, 12 S.E. 137. The rule is the same in the federal courts. Gunning v. Cooley, 281 U.S. 90, 94, 50 S. Ct. 231, 74 L.Ed. 720; McGuire v. Blount, 199 U.S. 142, 147, 26 S.Ct. 1, 50 L.Ed. 125; Garrison v. United States, 4 Cir., 62 F.2d 41.

The lands in question are situated in Dare County, on the Eastern Shore of North Carolina, at Nags Head, not far from the Virginia boundary, and were formerly embraced in Currituck County. Plaintiff asserted title in herself to a tract of 153½ acres granted by the State of North Carolina to her father, H. T. Greenleaf, on December 5, 1903. The complaint alleged that defendants had taken possession of a certain portion of this tract, had placed on record deeds assuming to convey the same, along with descriptive plats, had caused certain buildings to be erected thereon and had thereby cast a cloud upon plaintiff's title, for the removal of which this action was brought.

Defendants denied the validity of plaintiff's title and affirmatively asserted title

in themselves both through grants and adverse possession. Upon the second trial a jury was impanelled and the case tried as an action in ejectment. The plaintiff first offered in evidence an original grant from the State of North Carolina to H. T. Greenleaf, dated December 5, 1903, duly recorded in the Dare County Public Registry on January 18, 1904, and also evidence locating the boundaries of said grant as delineated on the court map, and as contended by plaintiff. Further evidence was submitted proving the death intestate of H. T. Greenleaf and of his wife, and the names of all his heirs-at-law including plaintiff, and their respective husbands and wives. A deed was then introduced showing the conveyance to the plaintiff by all other interested parties, than herself, of the entire fee to said land. This deed was dated August 24, 1932, and duly recorded December 20, 1932. Plaintiff then offered evidence that the defendants claimed title to the respective parcels of land described in certain instruments referred to in the complaint and comprised in the land designated on the court map by boundaries, corners, courses and distances, this being a portion of the tract designated on the court map as "Peterson 47 Ac." Defendants admit that such was their claim. The court surveyor was sworn and testified briefly, and then H. T. Greenleaf, a brother of the plaintiff, was sworn and testified at considerable length. A portion of his testimony, which was undisputed, was to the effect that he was present when the county surveyor of Dare County made the survey preliminary to the issuance of the grant from the State of North Carolina to his father, H. T. Greenleaf, above referred to. He stated that they began the survey on the Atlantic coast or beach in Nags Head Township at a juniper post on the northeast corner of the Cobb lot as represented by the point marked "A" on the court map. He further testified that at the survey there were present the county surveyor, witness' father and several of his brothers, and that two people from Nags Head were brought over to show the beginning point, one of these being J. C. Peterson, the father of the defendant J. B. Peterson, who accompanied the surveyor when certain of the lines were run. He stated that the original corner was pointed out, that there was not to witness' knowledge any existing controversy between his father, who claimed under his grant, and anyone else, and that so far as witness knew there had never been any controversy as to the proper location of the Cobb corner. The witness further stated that after this grant was issued a cottage situated thereon had been occupied each summer by either members of the Greenleaf family, or those whom they had let have it, until about three years ago, and that from the premises lots had been sold off from time to time, the first being sold shortly after the grant was issued.

The defendants first introduced a number of instruments, both to show their own title and color of title, and to show that the land covered by the grant under which plaintiff claims had been previously granted by the State of North Carolina, and that the Greenleaf grant is invalid under the provisions of the North Carolina statute. Three grants from the State of North Carolina to Peter Baum were submitted in evidence; the first dated December 5, 1800, and registered March 3, 1801, and containing the following description: "A tract of land containing 250 lying and being in the County of Currituck on the North banks. Beginning on the Sound side at the Glade, then running North 48 degrees East forty chains to the Sea side; then North 25 degrees West 60 chains along the Sea shore; then South 48 degrees West 49 chains to the Sound Side; then the Sound side by various courses to the first station. Entered October 28th., 1778 as by plat hereto annexed doth appear, together with all woods, waters, mines, minerals, hereditaments and appurtenances to the said land belonging or appertaining."

The second was dated December 5, 1800, registered March 4, 1901 (while the record both in this and the former appeal gives this date as 1901, it seems evident that it must have been 1801, since the record was made in the same book as the first grant to Peter Baum and on the following page). This deed contains the following description: "A tract of land containing 100 acres lying and being in the County of Currituck on the North banks to the North of Roanoke Inlet. Beginning on the Sound side opposite the Northwest end of Thick Island then running North 68 degrees East 54-½ chains to the Sea side, then South 24 degrees East 21 chains along the Sea side; thence S. 70 degrees W. 47 chains to the South side then the various

courses of the Sound side to the first station. Entered 28th. day of October, 1778."

The third of these grants to Peter Baum was dated November 28, 1805, and registered February 26, 1806, and contains the following description: "A tract of land containing 250 acres lying and being in the County of Currituck near Roanoke Inlet Beginning at Peter Baums patton corner running South 26 degrees East 60 chains along the Sea to said Baum's other patent; thence South 68 degrees West along said patton 54-½ chains to the Sound side; thence along the various courses of the Sound Northerly to said Baum's first patton; thence along said Patton North 48 degrees East 40 chains to first station. Entered 11th. November 1804."

It is defendants' contention that the Greenleaf patent embraces a portion of the land embraced in the first and third of the Peter Baum grants, and that the third of the Peter Baum grants lies between the first and second. It will be observed at once that the only way to locate the corners of the third of these tracts is by identifying the corners of other grants to Peter Baum. The first of these grants to Peter Baum attempts to fix the beginning corner on the sound side at the glade, and the second fixes the beginning corner on the sound side opposite the northwest end of Thick island. Unless, therefore, these descriptions of corners of themselves be considered sufficiently definite, or unless aided by competent testimony they be fixed at definite points, the grants must be held to be insufficient to convey title because too indefinite. Considerable testimony was introduced pro and con relating to the existence of a glade beginning somewhere near the sound side at Nags Head. The attempt to identify this particular glade, however, with the glade mentioned in the grant leaves much to speculation. It appears in evidence that the topography of that section of Nags Head, covered by plaintiff's grant, has been greatly changed within the memory of certain of the witnesses. Land marks such as trees and houses have been totally covered up and obliterated by sand hills brought in by the winds. One of the defendants' witnesses stated that there were many graves near the point in question but that they could not now be found because the sand hills have come over them a thousand feet deep. The testimony shows that the width of the glade had been affected by the encroachment of these sands. One of the witnesses for the defendants stated that when he first knew the glade it was a low bottom and water stood in it to a width of about 75 yards. He stated that there are still signs of that glade. If it be assumed that this is the same glade referred to in the Peter Baum grant there is no testimony indicating the width of it at that time. One of defendants' witnesses testified as to the appearance of the beach land; that sometimes there is a high hill and then again there is not any hill; sometimes a depression and then none; sometimes an inlet at a place that fills up and then comes through another. The witness said: "If it has changed like that in the last 75 years, it must have been in all probability vastly different in 1800 from what it was in 1880."

In 18 C.J. page 436, section 536, it is said as to the identity of land that it should be sufficiently distinguished from other tracts and be shown to be that described in the deed by relevant plats, surveys, bounds, deeds or such other documentary evidence as may be necessary and admissible, aided when requisite by the testimony of witnesses competent to testify to relevant and admissible facts of identity. In Hinchey v. Nichols, 72 N.C. 66 at page 67, the court said that "A big branch on Luke Lee's creek" supposes several big branches and is left indefinite, and also that "If an indefinite description will admit of comparison, the next description, 'a stake at or near the path, that crosses the said branch, that goes from Crane's to Sutton's,' is more indefinite." And the court held that the description was fatally defective and could not be made definite by parol evidence, since that would be to make a beginning corner and not to find a corner fitting the description to the thing, nothing being described. So in Archibald v. Davis, 50 N.C. 322, it was held that the description, "Beginning at a point in Laurel Swamp," was too vague to admit of location, the particular place on the swamp for the beginning point not being fixed. See, also, Mann v. Taylor, 49 N.C. 272, 69 Am.Dec. 750. The very recent case of A. E. Parsons v. John L. Roper Lumber Co. and Charles Lewis, 214 N.C. 459, 199 S.E. 626, is also in point. The opinion in that case was filed by the Supreme Court of North Carolina, November 23, 1938, the case being one in trespass to try title. The grant ruled on in that case contained several items of description pertaining to lo-

cation, to-wit, (a) south side of Neuse River, (b) Tornigan's Bay, (c) beginning at a pine on the south side of one of the prongs of Broad Creek, (d) crossing the head of the creek into the main Dismal, (e) a pine at the marsh above Thomas Nelson's Hammock, (f) down Tornigan's Bay etc. The exact courses and distances were given in the deed, but although the beginning point is at a pine and another pine is mentioned later on, the court held that it developed at the trial that none of the trees called for as marking the beginning or other corners remained, and that there were no vestiges of marked trees at any point of the survey. The court held that the natural objects mentioned such as Broad Creek, the Great Dismal and Tornigan's Bay were too remote and indefinite to mark with any degree of accuracy the location or boundary intended. See, also, Miller v. Holt, 47 W.Va. 7, 34 S.E. 956; Holly River Coal Co. v. Howell, 36 W. Va. 489, 15 S.E. 214.

■■ The Peter Baum grants introduced in evidence together with the oral testimony of defendants' witnesses wholly fail to show that the premises in question had been covered by the grant of the State of North Carolina prior to the Greenleaf grant. This grant, therefore, was not invalidated or affected as defendants contend by the provisions of section 7545 of the Consolidated Statutes of North Carolina.

■ The plaintiff having established in evidence a perfect paper title by grant from the State, and the defendants having failed to establish a superior, or like grant from the State, became charged with the burden of proof to establish their defense of adverse possession either with or without claim of color of title. In Thompson on Real Estate, Vol. 3, section 2518, it is held that in titles based on adverse possession, the burden of proving the elements constituting such possession is upon the party who asserts it, the presumption being that the possession is in accordance with legal title, and it requires clear and unmistakable evidence to overcome the presumption. A mere inference is never sufficient to establish title by adverse possession. In Bland et al. v. Beasley et al., 145 N.C. 168, 58 S.E. 993, it was held that when the title is claimed by adverse possession, the burden is on him who relies upon such claim to show continuous possession. The court also held that there is no presumption that the possession of real estate is adverse since Revisal 1905, § 386 (now C.S.N.C. § 432), provides that possession by another shall be deemed to have been under, and in subordination to legal title, unless such possession is shown to have been adverse. In Bryan v. Spivey, 109 N.C. 57, 13 S.E. 766, the court held that the defense of adverse possession, under color of title, is an affirmative one, and the onus probandi is, of course, upon the defendants to establish it. Ruffin v. Overby, 105 N.C. 78, 11 S.E. 251. See, also, Dugger v. McKesson, 100 N.C. 1, 6 S.E. 746, at page 751, wherein the court said: "The general principle upon which we try cases of this kind is that the plaintiff must recover on the strength of his own title, and not upon the weakness of that of his adversary, and the burden is upon the plaintiff to prove his case; but in this case the burden upon the question of location has shifted. * * * The plaintiffs having shown title, out of the state, and in themselves for the land, are entitled to recover, unless the defendants can show the right to the possession, which they admit they hold, under a better title than that of the plaintiffs." See, also, Carter Oil Co. v. Welker, D.C., 24 F.Supp. 753, at pages 757 and 758.

In their attempt to establish a chain of title, after introducing the foregoing grants, the defendants produced in evidence a deed from Burgess Baum to William S. Etheridge dated November 17, 1820, Book 15, page 215, purporting to convey two tracts or parcels of land lying in Currituck County, devised to the grantor by the last will and testament of his father, Peter Baum, deceased; one of these tracts containing 100 acres, "beginning on the Sound Side and running down the line of James Williams land Eastwardly to the Sea, thence along the Sea to Avery Tillett line and then along the Sound to the first station," the second parcel containing 200 acres, "beginning at Adam Baum's line So caled and runing Eastwardly to the Sea and then along the Sea to the line of the said William Etheridge's and then Westwardly along said Etheridge line to the Sound and thence along the Sound to the line of the said Adam Baum and So to the first station all which land is situated on the North Banks and contains a place well known by the name of Nags Head." In this connection no proof is made of any will from Peter Baum to Bur-

gess Baum, besides which, as will hereinafter appear, the lands, so insufficiently described, are not proved by oral testimony to embrace the lands in controversy in the instant case, or any part thereof. Following this deed, defendants introduced a deed from William Etheridge to Lemuel Tillett, dated February 19, 1824, registered April 25, 1825. This deed contains the following description: "A certain piece of land on the North Banks containing 85 acres beginning as follows to-wit beginning at a pine on the Sound Side adjoining the line of Stephen Beasly running a Easterly course by a line of marked trees to the Sea Side then running Southerly along the Sea to a Stake then a South westerly course to the Sound thence runing along the Sound side to the first station as mutch as will contain eighty five acres with all the rights and privileges thereunto belonging."

It will be observed that in this deed the beginning point is stated to be a pine on the Sound side adjoining the line of Stephen Beasly, but nowhere in the evidence is this pine identified. The only witness to testify regarding this corner stated that he had built a house on the Lemuel Tillett land and that there was some dispute about it, and, that he was shown an old tree on the sound which Evan O'Neal, hereinafter mentioned, and his brother, Farrow O'Neal, stated was the line, and that this tree was an *oak*. Nothing is shown in the deed or in the oral testimony locating the exact direction in which the lines ran. The deed evidently contemplated that a survey should be made so as to include the requisite acreage. There is no evidence, however, that such survey was ever made.

The next deed introduced in evidence was made on August 26, 1876, by Thomas E. Tillett and wife to Evan O'Neal describing: "A certain part of a tract of land situated on Nags Head to include all of our interest which is ½ of said tract of land, known as the Lemuel Tillett tract." There is nothing to show what was the acreage of the Lemuel Tillett tract at the time this deed was made, nor is it clearly established that this one half so sought to be conveyed was a part of the 85 acres included in the Etheridge deed. How Thomas Tillett acquired title is not set out in the deed, but one of defendants' witnesses testified that Thomas Tillett and his sister, Sally, were the only children of Lemuel Tillett that he ever heard anything about. There is no proof that Lemuel Tillett died

intestate and the testimony of the witness as to his children is extremely vague. The next deed was one from Evan O'Neal to J. C. Perry, dated June 20, 1882, and recorded June 24, 1882, purporting to convey "A certain part of the tract of land situated on Nags Head, it being one-half interest in the tract known as Lemuel Tillett tract and purchased by said Evan O'Neal of Thos. E. Tillett and wife." Defendant's next exhibit is a paper writing without actual seal, although reciting one, of A. H. Etheridge, Sheriff of Dare County, dated July 7, 1902, recorded July 10, 1902, in which it is recited that at a sale of real estate for the non-payment of taxes on the 18th of May 1902, the following real estate was sold: "Eighteen acres of land more or less, situated in Nags Head, Dare County, N. C. and being one-half interest in the Lemuel Tillett tract purchased by Evan O'Neal from Thos. E. Tillett and wife, and recorded in Book R, page 623, Register of Deeds Office, Dare County, N. C."

The paper further recited that the land had not been redeemed from such sale and that the land was, therefore, granted to Dare County. The signature to this deed was that of "August H. Etheridge" without any designation of his title as sheriff and no seal was affixed after his signature. Thereafter on July 14, 1902, by deed recorded the same date, the Board of County Commissioners of Dare County for a consideration of $11.11 paid by John Peterson, conveyed the aforesaid land, describing it as "Being 18 acres of land, more or less, it being one half interest in the Lemuel Tillett tract purchased by Evan O'Neal from Thomas Tillett and wife, being the land of J. C. Perry, deceased, and sold for taxes May 8, 1901, and recorded in book A, page 623, in the office of the Register of Deeds of Dare County." The John Peterson therein named was the same as John C. Peterson, the father of J. B. Peterson, and certain other of the defendants. Upon his death he left a will dated February 8, 1919, which was duly probated and recorded May 31, 1927, in which he provided, inter alia, that his executors should sell his lands and divide the proceeds of sale between his wife and children. M. G. Hollowell, who was appointed executor, renounced as such and upon waiver and request by the other heirs and beneficiaries of John C. Peterson, James B. Peterson was named as administrator C. T. A. and

letters of administration as such duly issued to him. Thereupon by deed dated May 13, 1929, and registered the same date, the said J. B. Peterson, as such administrator C. T. A. purported to convey to N. S. Melson "All that tract conveyed to John C. Peterson, by A. H. Etheridge, Sheriff, and others containing 47 acres, more or less situated on Nags Head, North Carolina, Dare County, and being one-half interest in the Lemuel Tillett tract purchased by Evan O'Neal from Thomas E. Tillett and wife," excepting therefrom certain portions which had been sold by the deceased John C. Peterson. It will be observed that although the lands described in this deed purport to cover only the 18 acre tract obtained from Etheridge, Sheriff, and identified as the same tract purchased by Evan O'Neal from Thomas E. Tillett and wife, the acreage is in the last deed stretched to 47. Next defendants introduced judgment roll in the case of Melson v. Daniels et al., dated May 19, 1932, and recorded June 11, 1932, in which it was purported to allot to Melson and Peterson one tract of 47 acres as shown on the court map by letters, courses and distances, and to Minnie Daniels et al. another tract of 47 acres likewise delineated and designated on said court map as "Martin 47." The first mentioned of these tracts embraces the land in dispute and a certain acreage in addition thereto. The testimony discloses no previous survey of the Lemuel Tillett lands, showing their location by known and visible boundaries. Nor does the evidence disclose any previous survey by J. C. Peterson or the defendants outlining the extent and boundaries of the lands claimed by them. The plats in question must have been made, and the judgment roll referred to, recorded approximately 30 years after the grant and plat to H. T. Greenleaf had been recorded.

 Not only do the deeds executed prior to 1929 not convey title to the land in controversy, but they do not even constitute color of title for the possession relied on by defendants. As heretofore pointed out, the boundaries set forth in the deeds from Burgess Baum to William S. Etheridge and from William Etheridge to Lemuel Tillett have not been located or identified. And the deeds from Thomas E. Tillett and wife to Evan O'Neal, from Evan O'Neal to J. C. Perry and from Etheridge, Sheriff, to John Peterson describe no land whatever by metes or bound-

aries but merely by reference to prior deeds the boundaries of which are not located. It is well settled that to constitute color of title a deed must describe the property, and that one which has no sufficient description of the land sought to be conveyed cannot avail even as color of title. 2 C.J.S., Adverse Possession, § 71, pp. 588, 589; Katz v. Daughtrey, 198 N.C. 393, 151 S.E. 879; Davis v. Stroud, 104 N.C. 484, 10 S.E. 666; Anderson v. Meadows, 162 N.C. 400, 78 S.E. 279.

 From the foregoing it must appear that the verdict should be sustained unless by the weight of the testimony defendants' plea of adverse possession has been established. Considerable testimony was introduced in an effort to identify the lands covered by the deeds and grants which they submitted in evidence, and to show continuous adverse possession of same in themselves and their predecessors in title. There was, however, a total failure to show that they, or their predecessors, had been in "open, notorious, continuous, and unequivocal possession, for the period required by law," of the lands in question as "ascertained and identified under known and visible lines or boundaries." Barfield v. Hill, 163 N.C. 262, 79 S.E. 677, at page 679, N.C.Revisal 1905, § 380, subd. 2 (now C.S.N.C. § 425, subd. 2); Mobley v. Griffin, 104 N.C. 112, 113, 10 S.E. 142. From a study of the court map of the lands in dispute, it will be shown that the various residences to which a large portion of defendants' testimony related, including the Tillett cottage, A. Martin cottage, J. Martin cottage and the Curles cottage are all situated without the borders of the land in dispute, and entirely beyond the limits of the Greenleaf grant, and further that if the interest conveyed to J. C. Peterson in what was formerly known as the Tillett lands was therein correctly described as 18 acres, it might well have been embraced in lands entirely outside the limits of the Greenleaf grant. While it is shown by the testimony that these various cottages were occupied from time to time, with the cultivation of some garden space near some of them, the testimony fails entirely to show that any portion of the lands so cultivated was embraced in the lands in dispute, or that there was any inclosure of any portion thereof, or any such adverse possession as might ripen into title. It is well settled that where one relies upon adverse posses-

sion alone, the title so acquired without color, is confined to the land occupied. Malone Real Property, 280; Anderson v. Meadows, 162 N.C. 400, 78 S.E. 279. See, also, McLean v. Smith, 106 N.C. 172, 11 S.E. 184, at page 185; Brown v. King, 107 N.C. 313, 12 S.E. 137. The possession relied on is not shown to have been had under known and visible lines and boundaries; no continuous possession is shown on the part of anyone, but merely disconnected acts of possession by persons between whom no privity is shown; and, as stated, no possession of any sort is shown of the land actually in controversy.

The dispute between the Greenleaf and Peterson families as to the lands in question arose sometime after the Greenleaf grant, which as stated above showed a perfect paper title, and whatever possession is shown by the Petersons of any of the land in dispute was not of sufficient time to ripen into title. The evidence is uncontradicted that where lots were sold and buildings erected by the Petersons, or their grantees, the Greenleafs made objection with reasonable promptness, and came to an agreement in most instances by making quitclaim deeds for a consideration.

The verdict was properly directed.

Affirmed.